## 12731

GARMANY v. SOUTHERN RY. CO.
TERRY v. SAME

(149 S. E., 765)

Messrs. *Frank G. Tompkins,* and *J. W. Manuel,* for appellant,

Messrs. *H. Klugh Purdy,* and *John P. Wise,* for respondents,

September 18, 1929.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

These suits by J. R. Garmany, as plaintiff, against the Southern Railway Company, and P. F. Terry, as plaintiff, against the same defendant, were commenced in the Court of Common Pleas for Jasper County, September 25, 1926, for the recovery of damages to lands and crops of the plaintiffs in said county of Jasper, at or near the town of Hardeeville, on account of alleged diversion and obstruction of surface water by the defendant. The defendant set up a general denial. By agreement the cases were tried together, at the December, 1926, term of Court of Common Pleas, for said

county, before his Honor, Judge T. J. Mauldin, and a jury. At the conclusion of the testimony the defendant made a motion for a directed verdict. His Honor, Judge Mauldin, after due consideration, refused the motion and submitted the case to the jury. The jury returned a verdict for the plaintiff J. R. Garmany in the sum of $700.00 as actual damages and $300.00 as punitive damages, and a verdict for the plaintiff P. F. Terry in the sum of $100.00 as actual damages. The defendant made a motion for a new trial, which motion the Court refused. From the entry of judgment on the verdicts, the defendant pursuant to due notice has appealed to this Court, and asks a reversal of the judgment in each case upon the grounds stated in the exceptions.

The exceptions are eight in number, and several of the exceptions contain a number of subdivisions, but it will not be necessary to consider the same separately. Under the view we take of the case, there are three main questions involved in the appeal, namely:

(1) Did the presiding Judge err in refusing defendant's motion for direction of a verdict?

(2) Did the presiding Judge err in his instruction to the jury?

(3) Did the presiding Judge err in refusing defendant's motion for a new trial?

While there are several minor questions presented, the answer to these questions will dispose of the appeal.

As to the first question: Did the presiding Judge err in refusing defendant's motion for a directed verdict? This motion was based upon the following grounds:

"(1) That absolutely no inference can be drawn from the testimony, except that the water complained of is surface water, and there is a total failure of proof that would tend to substantiate any cause of action whatever against the defendant in this case.

"(2) There is absolutely no testimony from which any possible inference could be drawn that would tend to sub-

stantiate or support plaintiffs' allegations to the effect that defendant, its agent, servants, and employees, collected surface water into an artificial channel and cast it upon plaintiffs in concentrated form to their injury and damage.

"(3) There is a total failure of proof from which any possible inference can be drawn that would support or tend to support any cause of action on behalf of plaintiffs by reason of the alleged acts complained of in the two complaints in these two actions."

There is no question about the water alleged to have caused the damage being surface water, it is so stated in the agreed statement of facts; but the question to be considered is whether or not, under the law of this State as to surface water, there was any testimony in the case which tended to establish liability against the defendant and warranted the presiding Judge in submitting the case to the jury.

The rule of law of force in this State governing the control of surface water has been so often stated by this Court that we do not deem it necessary to enter into a discussion of the rule at this time. For a full discussion of the subject, reference may be had to the cases of *Bradenberg v. Zeigler,* 62 S. C., 18, 39 S. E., 790, 55 L. R. A., 414, 89 Am. St. Rep., 887, and authorities therein cited; also *Cain v. South Bound R. R. Co.,* 62 S. C., 25, 39 S. E., 792; *Touchberry v. Railroad Co.,* 87 S. C., 415, 69 S. E., 877; *Rentz v. So. Ry. Co.,* 82 S. C., 170, 63 S. E., 743; *Deason v. So. Ry. Co.,* 142 S. C., 328, 140 S. E., 575; *Rivenbark v. A. C. L. R. R. Co.,* 124 S. C., 136, 117 S. E., 206.

For the purposes of this case we deem it sufficient to state that surface water is regarded as a common enemy, and every landed proprietor has the right to use such means as he deems necessary or expedient for the protection of his property from damages it may cause, except that the landed proprietor must not handle it in such a way as to create a nuisance, and must not by means of a ditch or other artificial means collect water and cast it in concentrated form upon

the lands of another, to the damage of his lands or health, nor by such means conduct surface water in concentrated form to a point where it results in injury to another's property or health. Such artificial channel need not necessarily extend to the line or edge of the injured person's lands, in order to sustain an action for damages, but must extend to such a point that the surface water conveyed therein or thereby results in injury to such person's lands or health.

Was there any testimony in the case at bar tending to establish such a state of facts; that is, did the defendant, by means of a ditch or other artificial means, collect surface water and cast it in concentrated form upon the lands of the plaintiffs, to their damage, or by such means conduct it to such a point that it damaged plaintiffs' lands or crops thereon? The question of nuisance or injury to health is not involved in this case.

In this connection we call attention to the following testimony, and especially to that we have italicized:

In the course of his testimony, Mr. H. W. Thomas, a witness for the plaintiffs, stated:

"I have lived near Hardeeville, Jasper County, for twenty years, and I know where Garmany's place is, and where Terry's place is, and have known those places for twenty years. Both are on west side of Southern Railway, and they adjoin each other. North of Garmany's place was a little hill, beside the section houses, and then just above that was a pond of water, which would at times accumulate a lot of water there, and the railroad went in there and removed this dirt, right at the section houses beside this hill, and threw the water from there down through Garmany's place. Between where the water accumulated and Garmany's place was a hill. The most of water stayed there until it evaporated. When it did run, it did not run toward Garmany, but went back in direction of Savannah River swamp, in western direction. *A number of acres holding water accumulated right beside where they cut ditch to take water down on Gar-*

many's place, about six or eight or maybe twelve acres with water standing on it. That water goes right from the place where they removed dirt right onto Garmany's place. Garmany's place comes first; then Terry's adjoins his. Dirt was removed before last July. I saw land in July of last year. Along during the latter part of July, when they had this water to do so much damage there, I passed his place and saw his ground standing under water, except a small portion where his house is. Most of the water came from above, where they cut the drain and let water on him from pond above. There was a sewer pipe under roadbed right opposite Garmany's place. Very little water was going through there, because a door was built and put against the pipe and stopped the water. * * *

"Q. Now, the dirt removed that you spoke of; you say it was on the right-of-way? A. Yes, sir; the ditch on the right-of-way, and went along in front of the section houses, extending about one hundred and fifty yards in length. Ditch extends both ways, above and below section houses. It is about six hundred yards from edge of Garmany's property to ditch. The upper edge of Garmany's property is from four hundred to six hundred yards from ditch. Ditch is in practically same place other ditch was, but this is larger ditch. I know a ditch has been along there, but I never paid any attention before to any ditch there to amount to anything.

"Q. And this was cut in the same place where you saw the other one, however small the other one was? A. Yes, sir; I have the slightest recollection of a ditch being there right where this one is now, and nothing like this one there now."

On this point the plaintiff in his testimony stated:

"Q. Just north of your place, what unusual was over there on Mr. Heyward's land? A. (No answer.)

"Q. What was the character of the land? A. Mr. Heyward?

"Q. Yes; right north of you. A. It was hilly.

"Q. It was hilly land? A. Yes, sir.

"Q. Did this land have any hills between your land and Mr. Heyward's land? A. It did. There was always a basin of water up in there of about three or four acres.

"Q. Where did this water get out of the basin? A. It would rise, and then it would fall, and it would go out toward the north, this way (indicating).

"Q. And whenever it overflowed, would it come back toward your land? A. No, sir; it would go north from my land.

"Q. Why wouldn't it come back on your land? A. Just about the section houses, or above, what we might term an embankment, and it was high there, and it held the water from me. It was just this way (indicating). It held the water, like my hand, up in there. It was just a basin. One morning of April, or May, this year, Mr. Duncan, supervisor of the railroad, had a train down there hauling dirt. I asked Mr. Duncan if he was building a double track now, and he said, 'No, we are cutting that hill, and the water we got down in here, because, when our men are switching on that side track, they have got to get out in water to couple and switch their train, and we have got to do something to keep our men out of the water.' And I said, 'Mr. Duncan, if you cut that in, and when it is high, and it is raining up there, and the water overflows me, and it will overflow me and my land.'

"Q. Did you tell Mr. Duncan, whenever he cut this ditch, and when it was high water, and that would let the water come down on you? A. Yes, sir; come down on me, and overflow my pasture, and back up to my house. He told me, 'You and Mr. Bookter see him.'

"Q. Did they cut a ditch there? A. They lowered the hill there for the water to get out of that basin, and *ran a ditch there, and after the ditch was put there the water would just flow, and it did not before. They must have used a shovel. I saw them there with the train; I saw them cutting down the hill, and I saw them unloading dirt.*

"Q. State whether or not they cut down this hill on their right-of-way, or down on somebody else's land. A. *They cut the land, and cut the slope on their own right-of-way, to let the water out from their side tracks, to let the water out from up there. It must have let the water out, for it came rushing down so fast it covered my pasture, and all my land, except about five acres.* It backed up until it couldn't go any farther.

"Q. Did it cover your farm land? A. The land that it covered in a shallow depression, and had no way to get out. * * *

"A. That the water comes, and water will follow its natural way. My land is lower next to the railroad than it is on the hill. I go up toward section houses almost every day. I was up there the same day they were shoveling off that embankment. They had a shovel of some kind, and they loaded dirt on cars and hauled it away. They were loading flat cars. They cut away back down there, and when the water falls in there it would go right out. I never saw a *ditch along* there *where they* had this shovel. Where they shoveled dirt is about three hundred yards from the nearest edge of my land. Work was done on the right-of-way. I did not say that Mr. Duncan said he was doing this to keep side track from getting soggy and wet. I asked him about it, and he told me they were going to *ditch it to keep* the water from getting in there when they were switching cars, and that their men to have to get out in the water."

The plaintiff, P. E. Terry, and other witnesses, testified that the surface water in question first flowed upon Garmany's land, and then across on the lands of the plaintiff Terry, and caused the damage complained of on Terry's land. At least, this was one inference to be drawn from the testimony.

As we view the case, there was testimony tending to establish the necessary allegations to support the cause of action set out in plaintiffs' complaints, and therefore the pre-

siding Judge properly overruled defendant's motion for a directed verdict.

As to the allegation, and testimony tending to establish the same, to the effect that the defendant went upon its right-of-way I stopped a waste pipe, which was under the road-bed of the defendant, and by such act caused some of the surface water to pond on plaintiffs' land, we desire to state that such alleged act was within the rights of the defendant, but the establishment of such alleged act was not necessary in order for the plaintiffs to recover in this action. In this connection, we call attention to the fact that, so far as the record discloses, there was no motion to strike this allegation from the complaint, no objection to testimony on the proof of the allegation was interposed, and no request was made to instruct the jury as to the same. However, it appears from an examination of the charge that the presiding Judge did not submit that issue to the jury, and no question as to the same is presented to this Court.

As to the second question raised by the exceptions, that the presiding Judge erred in his instructions to the jury, and because of such error the judgment should be reversed, we are again unable to agree with appellant. The fourth and fifth exceptions, under which the question is raised, are as follows:

"It was error for the Judge to charge the jury as follows: 'Negligence, in order to be actionable—that is, negligence in order to support an action at law—must be shown by the evidence in the case to have been the direct and proximate cause of the injury complained of. In other words, the plaintiff in each case says that by reason of the acts of the defendant, set forth in the complaint in each case respectively, the plaintiff was caused to suffer injury and damages as set forth in his complaint, and says that the acts complained of against the defendant were done in a negligent manner. I say to you, Mr. Foreman and gentlemen of the jury, that to recover upon the acts charged against the defendant, and in-

dicated in the complaint against the defendant as negligent, must be shown to have been the direct and proximate cause of the injury complained of, if they were negligent acts, if the acts complained of, for want of due care therein, and if those acts were the direct and proximate cause of the injury complained of, and then such acts be actionable in behalf of the plaintiff against the defendant,' etc.—the error being that:

"(a) A proprietor dealing with surface water on his own land is not bound to exercise reasonable care with regard to the rights of other landowners, and all proof showed defendant was dealing with surface water upon its own right-of-way in doing acts complained of.

"It was error for the Judge to charge the jury as follows: 'But I say to you, if one impound surface water, and so impounds by his act artificially that water to be concentrated in volume upon his property, and he does that, Mr. Foreman and gentlemen of the jury, and if in doing that work, whatever it may be, and he does it in a negligent way, and thereby causes it to be concentrated upon his neighbor, and then that neighbor would have a right to recover against one who does it in such a negligent manner or way, and if the act was the direct and proximate cause of any injury sustained by him by reason of the water so impounded'—the error being:

"(a) Charge is not responsive to the issues raised by the pleadings or by the testimony.

"(b) The question of negligence does not enter into the manner of the handling of surface water by a landowner in order to keep it off his own premises."

We agree with appellant to the extent that negligence does not enter into the case, but such charge, instead of being prejudicial to the defendant, was, under the law of force in this State, applicable to the facts of this case to which we have called attention, too favorable to the defendant, and affords the defendant no ground for complaint.

The sixth exception complains of error in the charge as follows:

"It was error for the Judge to charge the jury as follows: 'And if water is so impounded, and does it willfully and wantonly, and bearing in mind what I have said to you, the meaning or significance of wantonness, and if water is so impounded willfully and wantonly upon his property, and then concentrated upon his neighbor, and then he would be liable for punitive damages'—the error being:

"(a) Charge is not responsive to the issues raised by the pleadings, or by the testimony, there being neither allegation nor proof that defendant impounded surface water and then turned it loose .in concentrated form through artificial means on plaintiffs.

"(b) A landed proprietor may keep surface water off his own premises, even though by so doing he may throw or keep it on his neighbor, and even though he may know that to keep it off his own premises will throw it upon his neighbor, provided he do not impound it and then throw it in a concentrated form through an artificial channel."

In our opinion there was ample testimony, responsive to sufficient allegations, to support a verdict for punitive damages, and that this issue was properly submitted to the jury under clear instructions as well as the other issues involved in the case. We may state also that, so far as the record before this Court discloses, appellant presented no request to charge on any issue involved in the case.

The third question, that the presiding Judge erred in refusing to grant the motion for a new trial, raised under exceptions 7 and 8, must be considered in connection with the grounds stated in the motion for a new trial. That motion was as follows:

Mr. Manuel: "In these two cases, your Honor, I would like to urge the identical grounds that I pressed in my motion for a directed verdict, and, in addition to that, to call your Honor's attention to this:

" 'In defining or describing the liability of the law, with regard to surface water, to the jury, your Honor charged as to the exception upon which suits are based, which is used as a basis of the acts in this complaint; that is, it is actionable for a person to impound or hold water on his own premises accumulated, and then turn it loose in concentrated form on his neighbor, through an artificial channel, in that concentrated form. I take it that your Honor charged that right according to the decisions of the State. There is not a jot or tittle of testimony in these cases from which any inference could be drawn to the effect that the defendant impounded or accumulated surface water on its premises, or right-of-way, and then cast it in concentrated form, through an artificial channel, on the plaintiffs, or either of them.' "

What we have stated herein in our discussion of the first question is sufficient answer to this question. We think the presiding Judge committed no error in overruling the motion for a new trial.

The exceptions are overruled, and it is the judgment of this Court that the judgment of the Circuit Court be and is hereby affirmed.

Mr. Chief Justice Watts concurs.

Messrs. Justices Blease and Stabler concur in result.

Mr. Justice Cothran (dissenting) : These were separate actions for damages for injury to land by reason of the alleged negligent and willful act of the defendant company in releasing the water of a wet-weather pond (surface water), which was upon the right-of-way of the railroad company, by which the water in concentrated form was cast successively upon the lands of the plaintiffs below the level of the pond.

By agreement the cases were tried together before his Honor, Judge Mauldin, and a jury. At the conclusion of the testimony the defendant made a motion for a directed verdict in each case which was refused. The jury returned a verdict for the plaintiff, Garmany, for $700 actual dam-

ages and $300 punitive damages, and a verdict for the plaintiff Terry for $100 actual damages. The defendant made a motion for a new trial, which was refused. From the entry of judgments on the verdicts the defendant has appealed, upon exceptions which fairly raise the questions hereinafter considered.

It will be convenient to discuss the legal issues presented in the first-named case, *Garmany v. Railway Co*. While the facts in the two cases are not exactly similar, a disposition of the legal issues in the one case will dispose of the appeal in the other.

I regard the case as one of first importance, the decision affecting, as it will, the rights not only of railroad companies, but of the owners and cultivators of the soil, wherever similar conditions are presented. From the number of cases decided by the Courts all over the country, it appears that the relative rights and liabilities of the owners of adjacent lands upon different levels, in reference to the disposition of surface water, have given rise to innumerable controversies and present an instance of

" *  *  * The lawless science of our law,
That codeless myriad of precedents,
That wilderness of single instances,
Through which a few, by wit or fortune led,
May beat a pathway out."

It is essential that as clear a conception of the situation as possible be presented. It appears that the railroad track runs practically due north and south. Prior to April, 1926, there existed upon the side of the track, upon the railroad company's right-of-way, a pond of water in a depression of the land, filled with surface water which ran down the incline towards the railroad track. The pond was so near it as to interfere with the work of switchmen. The water in the pond was retained on the lower side by an elevation in the ground. Further down on the opposite side of the track were section houses of the company, erected upon its right-of-way, not

a great distance from the pond. The land of the plaintiff, Garmany, lay on the same side of the track as the pond, the line of which was the line of the railroad company's right-of-way, 75 feet from the center of the track. The upper line of his land struck the line of the right-of-way at a point between 400 and 600 yards from the lower rim of the pond; all of the land 75 feet wide, from the pond to the land line of the plaintiff, being a part of the right-of-way of the railroad company.

It appears that at the location in question there was a drainage area containing 85 acres. It embraced the lands of the plaintiffs and the right-of-way of the railroad company. Included within this 85-acre drainage area was the area which supplied the surface water which filled the pond; the pond area contained only 2.23 acres, 2.6 per cent. of the entire 85-acre area. The water which filled the depression in the pond area was retained at the lower side by an elevation of the ground in the direction of the Garmany land, but some 500 to 600 yards from it.

The lowest point of the 85-acre drainage area was a depression crossed by the railroad track upon a fill. All of the water in this area naturally made for this depression. At that point the railroad company had constructed a culvert pipe line at the base of the fill, through which this water was conducted to the other side of the track. If this water, debouched in such concentrated form, had caused injury to the land on the other side of the track, doubtless the landowner would have had a cause of action therefor.

Prior to April, 1926, the company had dug a ditch near the track and parallel with it, which carried the water from the pond through the opening in the elevation on the lower side of the pond, over its right-of-way and onto the plaintiff's land some 600 yards below. In April, 1926, the company, in order more completely to drain the pond, deepened the old ditch for a distance of about 150 yards, and extended it about 130 yards, still upon its right-of-way, in

the direction of plaintiff's land, some 400 yards below. This was done for the purpose of freeing its right-of-way from the ponded water. After the water left the extended ditch, it had 400 yards to be diffused upon the right-of-way before reaching the land of the plaintiff.

At the outset, particular attention is called to the nature of the action set forth in the complaint, which is as above indicated, for the reason that, in my opinion, there is a material distinction between an action based upon the release of water from a pond, casting it in concentrated form upon a lower owner of land (which is the cause of action set forth in the complaint), and an action for the diversion of surface water, not impounded, and not cast in concentrated form upon the lower owner's land (which is the situation developed by the evidence). The complaint states a well-defined and valid cause of action, entitling the plaintiff to the recovery of damages, if established by the evidence. The evidence shows an entirely different state of facts, which I shall endeavor to show does not entitle the plaintiff to damages.

The evidence shows that the water from the pond was released by the railroad company, for legitimate purposes, prior to and in April, 1926. There is no evidence tending to show that the plaintiff suffered any injury at the time by reason of that act. Its consequences were without harm to him. No injury occurred until months after the water had been released; that was in the following July, after the water had been released in April, when the surface water from the entire 85-acre drainage area, which included that of the area of the pond, of a three-days rain, overwhelmed his land, 500 yards, nearly a third of a mile, below the lower rim of the pond—water that had passed through the opening in the lower rim of the pond had joined the other surface water from 97.4 per cent. of the 85-acre area, necessarily in a diffused state. Even if it passed the opening in a semiconcentrated form, it had between 400 and 600 yards to

spread out, first upon the right-of-way, and then upon the land of the plaintiff.

The real complaint *now* of the plaintiff is that he has been damaged by the surface water which fell upon the area of the depleted pond (a limited fraction of the 85-acre area), which passed over that area, then through the opening, over the right-of-way intervening, and finally, after moving at least 500 yards, reached his land. So that he does not present a case either of casting the ponded water, by means of the opening, in concentrated form upon his land, or of casting surface water, no longer ponded since the release, by means of the opening, in concentrated form upon his land.

But, to give the plaintiff the benefit of every possible contention, it is but fair to consider this theory of the situation: Assuming that the water which fell upon the pond area was halted by the barrier of the lower rim of the pond, and in a state of nature would never have reached his land, but for the opening in the rim, the contention is plausible, and is sustained by Courts which have adopted the civil-law rule upon the subject, that the plaintiff was entitled to have the water flow as it was accustomed to flow, and the defendant was without right to divert it into a course other than that. If sustained, this contention would lead to the conclusion that the upper owner would be liable for such diversion, regardless of the fact that the water was not cast upon him in a concentrated form. It would be adding a new element of liability to the only two recognized by this Court under the common-law rule: (1) That it created a nuisance; and (2) that the water was cast in a concentrated form upon the lower owner.

It has been decided over and over again by this Court that surface water is a common enemy, which every proprietor, upper or lower, may fight and get rid of as he may, provided he does not thereby create a nuisance, or, if an upper owner, cast it upon the lower owner in concentrated form. *Edwards v. Railroad Co.,* 39 S. C., 472, 18 S. E., 58,

22 L. R. A., 246, 39 Am. St. Rep., 746; *Baltzeger v. Railroad Co.*, 54 S. C., 242, 32 S. E., 358, 71 Am. St. Rep., 789; *Lawton v. Railroad Co.*, 61 S. C., 548, 39 S. E., 752; *Brandenberg v. Zeigler*, 62 S. C., 18, 39 S. E., 790, 55 L. R. A., 414, 89 Am. St. Rep., 887; *Cain v. Railroad Co.*, 62 S. C., 25, 39 S. E., 792; *Johnson v. Railroad Co.*, 71 S. C., 241, 50 S. E., 775, 110 Am. St. Rep., 572; *Touchberry v. Railroad Co.*, 87 S. C., 415; 69 S. E., 877; *Faust v. Richland County*, 117 S. C., 251, 109 S. E., 151; *Rivenbark v. Railroad Co.*, 124 S. C., 136, 117 S. E., 206; *Deason v. Railroad Co.* 142 S. C., 328, 140 S. E., 575; *Gould, Waters*, § 265.

The rule is thus declared in the case of *Baltzeger v. Railroad Co.*, 54 S. C., 242, 32 S. E., 358, 359, 71 Am. St. Rep., 789: "The gist of the so-called 'common-law rule' is that one may do as he pleases with his property, regardless of the effect upon surface water. This rule recognizes the right of each proprietor to fight surface water (*Jones v. Hannovan*, 55 Mo., 462); and the result is that, if carried to its ultimate conclusion, it simply means that the Courts will recognize no wrong in any action undertaken for the purpose of getting rid of surface water. In other words, no legal right of any kind can be claimed *jure naturæ* in the flow of surface water; so that neither its detention, diversion, nor repulsion is an actionable injury, even though damage ensue."

The Court continues: "The only exception to the rule that, surface water being a common enemy, every landowner has the right to deal with it in any such manner as he may see fit, is that it is subject to the general law in regard to nuisances, if its accumulation has become a nuisance *per se*, as, for example, whenever it has become dangerous, at all times and under all circumstances, to life, health, or property."

The Court may have added a further well-recognized exception: That, in fighting off surface water, the upper owner may not cast it in concentrated form upon the lower owner.

In *Edwards v. Railroad Co.*, 39 S. C., 472, 18 S. E., 58, 59, 22 L. R. A., 246, 39 Am. St. Rep., 746, the Court held:

"Under the common-law rule, surface water is regarded as a common enemy, and every landed proprietor has a right to take any measures necessary to the protection of his own property from its ravages, even if, in doing so, he throws it back upon a coterminous proprietor, to his damage, which the law regards as a case of *damnum absque injuria,* and affording no cause of action."

This case presents a situation different from any that I have discovered in the books and I have read a multitude of them. These controversies may be classified thus:

(1) Where a lower proprietor has erected a barrier at or near the line between his land and that of an upper proprietor, by means of which the flow of surface water, halted at the barrier and prevented from entering upon the land of the lower proprietor, has been turned back upon the upper proprietor; all authorities agree that under the common-law rule adopted in this state (*Edwards v. Railroad Co.,* 39 S. C., 472, 18 S. E., 58, 22 L. R. A., 246, 39 Am. St. Rep., 746), the lower proprietor is within his rights, and that the upper proprietor has no cause of action against him, though the act results in turning the water back upon the land of the upper proprietor to his damage.

(2) Where an upper proprietor, by means of drains or ditches, has collected the surface water upon his own land, and turned it in concentrated form upon the land of the lower proprietor to his damage; all the authorities agree that he has no right to do this, and that the lower proprietor has a cause of action against him for damages on account of the injury to his land or crops caused thereby.

(3) Where an upper proprietor has upon his land a pond of water produced by surface water, in a basin created by his own act or by the natural conformation of the land, and by the construction of ditches or by cutting through the imprisoning barrier, he turns the water in concentrated form upon the land of the lower proprietor; all the authorities agree that he has no right to do this, and that the lower

proprietor has a cause of action against him for damages on account of the injury to his land caused thereby.

Although the allegations of the complaint present a case coming within the third classification, the facts do not develop such a case; they present a situation, as I have observed, different from any case that I have encountered. It seems clear that the only effect of thus allowing the surface water to pass on was to add that much water to what was being contributed by 97.4 per cent. of the 85-acre area. Aside from the manifest injustice of holding the railroad company liable *for all* of the injury caused by the surface water upon the 85-acre area, I think that the company, as any other owner of a dominant estate, was justified for the protection of its own property, in releasing the water from the pond, and opening the way for the escape of surface water *which subsequently fell,* even if it did pass mediately to the land below. It is inconceivable that such surface water was turned in concentrated form upon the lower lands, after having traversed 500 yards over the company's own property.

In a note to *Manteufel v. Wetzel* (Wis.), 19 L. R. A. (N. S.), 167, the author, after citing cases pro and con, declares: "The tendency of the later cases, however, is to permit the piercing of a natural barrier, so as to permit the water from such a pond, marsh, or slough to run off through a natural depression or ravine, or to suffer the deepening of the natural outlet, so long as the water is not diverted from its natural course."

The annotator further says: "Thus it was held in *Sheehan v. Flynn,* 59 Min., 436, 26 L. R. A., 632, 61 N. W., 462, that the owner of land upon which there was a depression covering about 20 acres, in which, during the wet season, water accumulated, and stood until it had evaporated or been absorbed by the soil, might drain the same by connecting it, by an artificial ditch 96 rods long, with the head of a ravine which crossed other ground and emptied into a lake,

notwithstanding that at times the water in the lake was thereby raised so as to cover an acre or two of another person's land which would not otherwise be submerged. The Court emphasized the fact that the method of drainage adopted was the only available one, and that the consequent injury to others as compared to the benefit to be derived from the improvement was not so great as to make it unreasonable."

And: "The doctrine of *Sheehan v. Flynn* was applied in *Gilfillan v. Schmidt,* 64 Minn., 29, 31 L. R. A., 547, 58 Am. St. Rep., 515, 66 N. W., 126, by holding that the owner of land upon which there was a pond or marsh having a natural outlet, whence in wet seasons its waters flowed through a fairly well-defined channel or water way across another's land, was entitled to deepen the natural outlet on his own land, although the result was to drain off waters from the pond or marsh which otherwise would not escape, but remain stagnant until evaporated or absorbed; and that he was not liable for damages to the other party's land by the overflow of the water from such outlet at a time of a very heavy rainfall, even assuming that the overflow was caused by the deepening of the natural outlet, and the consequent increase of the drainage."

And: "So, an owner of land has the right, in the interests of good husbandry, to drain ponds or basins thereon of a temporary character and which have no natural outlet or course of flow, by discharging the waters thereof by means of an artificial channel into a natural surface-water drain on his own property, and through such drain over the lands of another proprietor in the general course of drainage in that locality, even though the flow in such natural drain is thereby increased over the lower estate; provided this is done in a reasonable and careful manner and without negligence."

In *Shaw v. Ward,* 131 Wis., 646, 111 N. W., 671, 675, 11 Ann. Cas., 1139, the Court said: "No reason is perceived why respondents could not rightfully have filled up the depression on their lands, preventing the water from

accumulating thereon and causing it to pass on to the east and reach appellants' lands by way of the ditch, or to have at any time opened the basin into the draw, or a ditch if necessary, to the east and emptied the reservoir, being responsible, if at all, for the damages thus caused to others, but not for damages caused by the improvement preventing surface water from subsequently being retained on their lands, or, at a time when the pond had disappeared by evaporation and absorption, have opened the basin towards the natural draw so as to prevent a future accumulation."

In *Hopkins v. Taylor,* 128 Minn., 511, 151 N. W., 194, the Court said: "The law of the case is well settled. The old common-law rule that surface water is a common enemy, which each owner may get rid of as best he can, is in force in this State, except that it is modified by the rule that he must so use his own as not unnecessarily or unreasonably to injure his neighbor.' *Sheehan v. Flynn,* 59 Minn., 436, 61 N. W., 462, 26 L. R. A., 632, following *O'Brien v. City of St. Paul,* 25 Minn., 331, 335, 33 Am. Rep., 470. To the end that land shall be made productive, 'a landowner may rid his land, for any legitimate purpose, of surface waters, even to the injury of the land of another; but in doing so he must use all reasonable means to avoid unnecessary injury to the land of others—that is, he cannot, in draining his own land, cause unreasonable or unnecessary injury to the land below. What is reasonable in such cases depends upon the special facts of each particular case.' *Rieck v. Schamanski,* 117 Minn., 25, 32, 134 N. W., 228, 230. If it be practicable to deliver the water drained, into a natural drain or water course, it is the duty of the landowner to do so. *Peterson v. Lundquist,* 106 Minn., 339, 342, 119 N. W., 50. But it is not indispensable that the artificial drainage be along the natural course of drainage. Circumstances may warrant the landowner in cutting through a watershed, or in draining a marsh or pond that has no natural outlet or course of drainage. Whether the course pursued follows the natural course

of drainage is an important factor in determining the question of reasonable use, but it is not controlling. *Howard v. Illinois Central R. Co.,* 114 Minn., 189, 130 N. W., 946; *Rieck v. Schamanski,* 117 Minn., 25, 134 N. W., 228. Any failure to observe the duty of reasonable care in such matters is negligence and renders the landowner liable. *Howard v. Illinois Central R. Co.,* 114 Minn., 189, 193, 130 N. W., 946. The right of drainage of surface water may on occasions work some hardship upon the lower proprietor, but it has been recognized in this State for many years and it has furnished a practicable, and on the whole an equitable, working rule for the reclamation and improvement of the large areas of wet land with which the State abounds."

In *Fenton v. Adams,* 221 Ill., 201, 112 Am. St., 171, the Court said: "In *Peck v. Herrington,* 109 Ill., 611, 50 Am. Rep., 627, the conclusion is reached that the owner of a dominant heritage may, by ditches or drains, drain his own land into the natural or usual water-course, even if the quantity of water thrown upon the servient heritage is thereby increased; and the right of Peck to drain water out of ponds and cause it to flow upon the land of Herrington along the natural course of the water was expressly recognized, where, had the drain not been put in, the water would have remained in the ponds until it seeped away or evaporated, and never would have flowed upon the lands of Herrington. From this case, and the numerous cases which have followed it, the law deduced is this: If an owner·have upon his land when the surface is in its natural state, a basin in which water accumulates, and from which, when filled and overflowing, the water passes in a particular place where the rim of the basin is lower than elsewhere, and then flows through a depression to and upon the land of another, the natural outlet and natural course for that water is through that low place in the rim and through that depression, and the owner may lawfully cut down the rim and deepen the depression upon his own land so as to entirely drain the basin and cause·

the water therefrom to pass through the depression to and upon the land of his neighbor, if the neighbor's land be low enough to entirely drain the basin, even though the amount of water flowing through this depression to the servient heritage is thereby increased, and water which would be retained in the basin if the rim and depression were left as in a state of nature and never reach the land of the neighbor, is thereby cast upon his heritage. It follows, therefore, that Akker would have the right to so deepen the natural course leading from the basin to the railroad's right-of-way as to entirely drain that basin, and cast all its water, except such as disappears by percolation and evaporation while flowing through the drain, upon the property of the railroad company, although it is apparent that in so doing he would pour large quantities of water upon the right-of-way which in a state of nature must remain in the basin. * * * The owners of the land on which this basin is located would have no right to cut through the rim at some place other than the lowest point therein, and thereby drain the water upon the land of another which is not reached by the course which the water follows when it overflows naturally. As long as the drainage results in carrying the water along the natural course the servient proprietor may not complain, even though natural barriers on the higher land have been cut down and the flow of water both accelerated and increased. Were the rule otherwise there would be no method by which any one owner could improve his land by the construction of ditches and drains which would carry the drainage upon another's property, because the purpose of such improvements in every instance is to hasten and increase the flow of water, and this object is only attained by the removal of natural barriers."

I think that this ruling should be so modified as to require the upper proprietor to exercise due care in releasing the water at the lowest point of the rim, so as to cause as little injury to the lower proprietor as was reasonably pos-

sible. This would deny to him the right to release the water suddenly and in concentrated form, which would necessarily cause injury. The point is illustrated by the case of *Yerex v. Eineder,* 86 Mich., 24, 48 N. W., 875, 24 Am. St., 113:

The upper proprietor had upon his land a swampy place, about one hundred yards from the line of the lower proprietor's land; between the lower end of the swamp and the land of the lower proprietor there was a ridge which kept the water of the swamp from the land of the latter; the upper proprietor cut through this ridge and turned the water in a body upon the other's land. The lower proprietor brought an action for damages. Prior thereto the parties agreed to employ a surveyor to determine in which direction the water would naturally go; the defendant agreed that, if the surveyor found that the water naturally by the levels taken would run away from the ridge, he would fill up the opening in the ridge. The surveyor found that water would naturally flow away from the ridge. It was held that the defendant under these circumstances had no right to cut the opening and turn the water in concentrated form upon the plaintiff's land.

In *Harbison v. Hillsboro,* 103 Or., 257, 204 P., 613, 617, the Court held: "A landowner has the right to protect his premises from surface waters by causing the same to flow by the natural and necessary course to adjoining lands, subject to the limitation that he cannot rightfully collect surface waters on his premises in a reservoir and then discharge the same onto the land of another to his injury. A person on whose land surface water coming from his own and other lands collects in a natural basin or depression and there remains except in seasons of drought has the legal right to rid his land of the water by causing the same, by such means as may be reasonably necessary, to flow in the natural course of drainage onto adjoining lands, though the water may from thence, by natural or artificial means for which he is

not responsible, reach and spread out over the lands of others. In such a case the landowner effecting the drainage of his land by means of a ditch is only in the exercise of the right of every person to defend his premises against surface water, and for consequential damages to other landowners the latter have no remedy against the former."

"The obstruction of surface water or an alteration in the flow of it affords no cause of action in behalf of a person who may suffer loss or detriment therefrom against one who does no act inconsistent with the due exercise of dominion over his own soil." *Gannon v. Hargadon,* 10 Allen (Mass.), 106, 87 Am. Dec., 625.

It is clear that the natural course of the surface water which falls on the depleted pond area is exactly the course it took after the opening in the rim was made. This is demonstrated by the palpable fact that if the pond area, instead of having been drained by the opening, had been filled with earth, the surface water would have moved down over the right-of-way and the land of the plaintiff. There is some testimony to the effect that at times the water in the pond would move in a different direction from the land of the plaintiff, which is to expect the Court to believe that water will run uphill.

I think that the divergence in the various decisions of the Courts upon this proposition is due solely to the fact that some have adopted the civil-law rule, and others the common-law rule. Many Courts, adopting the civil-law rule, have held that an upper owner has no right to cut through the rim of a restraining barrier and subject the land below to a flow of surface water, which otherwise would be retained in the pond until dissipated by percolation or evaporation; a ruling which is entirely inconsistent with the common-law rule adopted in this State.

The rule of the civil law was thus expressed in the Code Napoléon: "The owner of the lower ground is bound to receive from the higher ground the water which naturally

flóws down, without the human hand contributing to its course. The owner of the lower ground is not permitted to make a dike to prevent such flowing. The owner of the higher ground can do nothing to aggravate the servitude of easement of the lower ground." *Livingston v. McDonald,* 21 Iowa, 160, 89 Am. Dec., 563.

The rule of the common law is exactly the reverse of the rule of the civil law, and, adopting the phrasing of the Code Napoléon, it may thus be expressed: "The owner of the lower ground is *not* bound to receive from the higher ground the water which naturally flows down, without the human hand contributing to its course. The owner of the lower ground *is* permitted to make a dike to prevent such flowing. The owner of the higher ground *may,* in his effort to dispose of the surface water flowing upon and over his land, by such means as he may employ, aggravate the servitude or easement of the lower ground."

The civil-law rule protects the upper owner from the act of the lower, and protects the lower from the act of the upper, which has much to commend it; the common-law rule takes the bridle off of both, and permits each to treat surface water as a common enemy, fighting it with such weapons as he may employ, subject to the restrictions that neither may create a public nuisance, and that the upper owner may not collect the water in an artificial channel and turn it upon the lower, in a concentrated form.

There may be, and there has been for hundreds of years, a difference of opinions as to the proper rule; but I take it that, after the many decisions of this court affirming adherence to the common-law rule, the Court will not at this late day depart from it. There are two perfectly sound reasons which sustain the right of the upper owner to open and drain the pond, even if water which theretofore has been restrained in its flow by a natural elevation of the land did not reach the land of the lower owner, at least with Courts which adhere to the common-law rule:

1. The bed of a pond and sinkhole may be filled up so as to prevent the water from accumulating in them, although the result is to hasten the flow along its natural course. *Gregory v. Bush,* 64 Mich., 37, 31 N. W., 90, 8 Am. St., 797, *Yerex v. Eineder,* 86 Mich., 24, 48 N. W., 875, 24 Am. St., 113; *Osten v. Jerome,* 93 Mich., 196, 53 N. W., 7; *Launstein v. Launstein,* 150 Mich., 524, 114 N. W., 383, 121 Am. St., 635. If the upper owner has the right to fill up the pond entirely with earth, and thus force the surface water which theretofore was restrained by the lower rim of the pond, along its natural course in a diffused form over and upon the land of the lower owner, I can perceive no substantial reason why he could not accomplish the same result by opening the lower rim of the pond and releasing the water, not in a concentrated form, upon the land of the lower owner. His immunity in either case would be founded upon his right to fight the common enemy with such weapons as were at hand. I concede that this right would not be recognized by Courts which have adopted the civil-law rule, nor by courts which have adopted the common-law rule if the immission of the water be in concentrated form.

In *Goodale v. Tuttle,* 29 N. Y., 459, Chief Justice Denio thus observed: "In respect to the running off of surface water caused by rain or snow, I know of no principle which will prevent the owner of land from filling up the wet and marshy places on his own soil, for its amelioration and his own advantage, because his neighbor's land is so situated as to be incommoded by it."

In *Horton v. Sullivan,* 97 Mich., 282, 56 N. W., 552, it was held, quoting syllabus: "Defendant can in the interest of good husbandry, fill in the cuts, washes, and holes in his premises, though in so doing he obstruct the flow of water from plaintiff's land."

In *Rawstion v. Taylor,* 33 Eng. L. & Eq., 428, Platt, B., in delivering his opinion, said: "This was merely surface water, and the defendant had a right to drain his land, and

the plaintiff could not insist upon defendant maintaining his field as a mere water table."

In *Gregory v. Bush*, 64 Mich., 37, 31 N. W., 90, 8 Am. St., 797, it was held, quoting syllabus: "Owner of land has right, in interest of good husbandry, and in the improvement and tillage of his farm, in good faith, to fill up stagnant pools, sag holes, and basins on his land, so that no water will accumulate or remain in them, even if the water arising from rainfall or melting snows should thereby, in natural processes, find its way to the land of an adjoining owner, and incidentally increase the flow thereon; but he cannot, by artificial drains or ditches, collect the waters of such low places and cast them in a body upon the proprietor below, to his injury."

2. It seems to me a reciprocal and just conclusion that if, under the common-law rule, the lower owner may arrest by embankments, at his line, surface water originating upon the upper owner's lands, and throw it back upon him with impunity, he should not be allowed to complain that the upper owner by artificial means has increased the flow of surface water upon the lower owner's land, in a diffused form. It does not seem just that the lower owner, who has no interest in the surface water that comes toward his land from the land of the upper owner, except to fight it off, and, if necessary, to throw it back upon the upper owner, should be allowed to condemn a portion of the land of the upper owner, covered by the pond, to perpetual sterility, a breeding place for mosquitoes, and a source of miasmatic vapors.

The blueprint in evidence shows that the plaintiff himself has made full use of his right to facilitate the flow of surface water upon his land by the construction of ditches hastening it to the culvert pipe under the track. Notwithstanding the fact that the water from the pond is only 2.6 per cent (by comparison of areas) of the entire output of the 85-acre area and the pond area, it is proposed to charge the

railroad company with the entire damage and add for good measure punitive damages.

I do not subscribe to the doctrine that the question of negligence on the part of an upper proprietor in repelling the injurious effects of surface water upon his own land has no place in the consideration of the Court, though I must admit that such has been declared by this Court in more than one case. See *Touchberry v. Railroad Co.*, 87 S. C., 415, 69 S. E., 877. It seems to me that the exercise of every legal right is dependent upon the proper exercise of that right, and that a negligent exercise gives rise to a cause of action. See *Wallace v. Railroad Co.*, 34 S. C., 62, 12 S. E., 815.

I think that, even if the upper owner be liable under the circumstances for actual damages, there is not the slightest foundation for punitive damages. The upper owner was dealing with its own property, for the protection of that property, in the exercise of a public, or at least a quasi public, duty. It did nothing but what manifestly it supposed it had a legal right to do, not animated by a wicked purpose to injure the plaintiff.

Finally, it appears to me that to sustain the judgment in this case is to reverse the oft-decided principle that the upper owner has the right, as the lower owner has, to fight the common enemy without accountability to the other adjacent owner, except in the particulars already mentioned; that it means that the upper owner must forever keep upon his land a pond of water, which is not only of no use to him, but which condemns to perpetual sterility a part of his property over which the law gives him dominion. *"Cujus est solum ejus est usque ad cœlum."*

For the benefit of those who may wish "by wit or fortune led" to further pursue the elusive subject, reference is made to the following authorities, which I have with varying thoroughness digested:

*Peck v. Goodberlett,* 109 N. Y., 180, 16 N. E., 350; *Mitchell v. Bain et al.,* 142 Ind., 604, 42 N. E., 230; *Wed-*

*dell et al. v. Hapner,* 124 Ind., 315, 24 N. E., 368; *Dayton v. Rutherford,* 128 Ill., 271, 21 N. E., 198; *Anderson v. Drake,* 24 S. D., 216, 123 N. W., 673, 27 L. R. A. (N. S.), 250; *Priest v. Maxwell et al.,* 127 Iowa, 744, 104 N. W., 344; *Pohlman v. Railway Co.,* 131 Iowa, 89, 107 N. W., 1025, 6 L. R. A. (N. S.), 146; *Davis v. Fry,* 14 Okl., 340, 78 P., 180, 69 L. R. A., 460; *Jacobson v. Van Boening,* 48 Neb., 80, 66 N. W., 993, 32 L. R. A., 229, 58 Am. St. Rep., 684; *Johnson v. White,* 26 R. I., 207, 58 A., 658, 65 L. R. A., 250; *Harbison et al v. City of Hillsboro,* 103 Or., 257, 204 P., 613; *Pyle v. Richards,* 17 Neb., 180, 22 N. W., 370; *Todd v. County of York,* 72 Neb., 207, 100 N. W., 299, 66 L. R. A., 561; *Baltimore Breweries Co. v. Ranstead,* 78 Md., 501, 28 A., 273, 27 L. R. A., 294; *Bonte v. Postell,* 109 Ky., 64, 58 S. W., 536, 51 L. R. A., 187; *Wharton v. Barber,* 188 Ky., 57, 221 S. W., 499; *Tyrus v. Kansas City, Ft. S. & M. R. Co.,* 114 Tenn., 579, 86 S. W., 1074; *Madisonville, H & E. R. Co. v. Cates,* 138 Ky., 257, 127 S. W., 988, 137 Am. St. Rep., 379; *Grant v. Railway Co.,* 149 Mo. App., 306, 130 S. W., 80; *Railway Co. v. Magness,* 93 Ark., 46, 123 S. W., 786; *Robertson v. Road Co.,* 116 Ky., 913, 77 S. W., 189; *Livingston v. McDonald,* 21 Iowa, 160, 89 Am. Dec., 563; *Martin v. Jett,* 121 La., 501, 32 Am. Dec., 120; *Kilgore v. Grevemberg,* 10 La. Ann., 689, 63 Am. Dec., 597; *Southern Ry. Co. v. Lewis,* 165 Ala., 555, 51 So., 746, 138 Am. St. Rep., 77; *Stinson v. Fishel,* 93 Iowa, 656, 61 N. W., 1063; *Rhoads v. Davidheiser,* 133 Pa., 226, 19 A., 400, 19 Am. St. Rep., 630; *Meixell v. Morgan,* 149 Pa., 415, 24 A., 216, 34 Am. St. Rep., 614; *Galbreath v. Hopkins,* 159 Cal., 297, 113 P., 174; *Johnston v. Hyre,* 83 Kan., 38, 109 P., 1075; *Kane v. Bowden,* 85 Neb., 347, 123 N. W., 94; *Lincoln St. Ry. Co. v. Adams,* 41 Neb., 737, 60 N. W., 83; *Valentine v. Widman,* 156 Iowa, 172, 135 N. W., 599; *Peck v. City of Baraboo,* 141 Wis., 48, 122 N. W., 740; *Miller v. Laubach,* 47 Pa., 154, 86 Am. Dec., 521; *Barrow v. Landry,* 15 La. Ann., 681,

77 Am. Dec., 199; *Hooper v. Wilkinson*, 15 La. Ann., 497, 77 Am. Dec., 194; *Kauffman v. Griesemer*, 26 Pa., 407, 67 Am. Dec., 437; *Humphreys v. Moulton*, 1 Cal. App., 257, 81 P., 1085; *Trigg v. Timmerman*, 90 Wash., 678, 156 P., 846, 1916-F, L. R. A., 424; *Lessenger v. City of Harlan*, 84 Iowa, 172, 168 N. W., ·803, 5 A. L. R., 1523; *New York, etc., R. Co. v. Jones*, 94 Md., 24, 50 A., 423; *Cox v. Odel*, 1 Cal. App., 682, 82 P., 1086; *Drew v. Hicks*, 4 Cal. Unrep. Cas., 440, 35 P., 563; *Wood v. Moulton*, 146 Cal., 317, 80 P., 92; *Hoganon v. Railway Co.*, 31 Minn., 224, 17 N. W., 374; *Boll v. Ostrott*, 25 S. D., 513, 127 N. W., 577; *Pettigrew v. Village of Evansville*, 25 Wis., 223, 3 Am. Rep., 50; *Hargreaves v. Kimberly*, 26 W. Va., 787, 53 Am. Rep., 121; *Hughes v. Anderson*, 68 Ala., 280, 44 Am. Rep., 147; *Nye v. Kahlow*, 98 Minn., 81, 107 N. W., 733; *Sheker v. Machovec*, 139 Iowa, 1, 116 N. W., 1042; *Cronin v. Payne*, 157 Mich., 104, 121 N. W., 290; *Shavlik v. Walla*, 86 Neb., 768, 126 N. W., 376; *Offley v. Garlinger*, 161 Mich., 351, 126 N. W., 434; *Williams v. Lake Drummond Water & Canal Co.*, 130 N. C., 746, 41 S. E., 1030; *Roberts v. Baldwin*, 151 N. C., 407, 66 S. E., 346; *Parker v. Norfolk & C. R. Co.*, 123 N. C., 71, 31 S. E., 381; *Shaw v. Ward*, 131 Wis., 646, 111 N. W., 671, 11 Ann. Cas., 1139; *Lattimore v. Davis*, 17 La., 161, 33 Am. Dec. 581; *Adams v. Walker*, 34 Conn., 466, 91 Am. Dec., 742; *Butler v. Peck*, 16 Ohio St., 334, 88 Am. Dec., 452; *Mizell v. McGowan*, 129 N. C., 93, 39 S. E., 729, 85 Am. St. Rep., 705; *Kansas City, etc., R. Co. v. Lackey*, 72 Miss., 881, 16 So., 909, 48 Am. St. Rep., 589; *Elser v. Village of Gross Point*, 223 Ill., 230, 79 N. E., 27, 114 Am. St. Rep., 326; *Yerex v. Eineder*, 86 Mich., 24, 48 N. W., 875, 24 Am. St. Rep., 113; *Gregory v. Bush*, 64 Mich., 37, 31 N. W., 90, 8 Am. St. Rep., 797; *Fremont, etc., R. C. v. Marley*, 25 Neb., 138, 40 N. W., 948, 13 Am. St. Rep., 482; *Hopkins v. Taylor*, 128 Minn., 511, 151 N. W., 194; *Vick v. Strehmel*, 197 Wis., 366, 222 N. W., 307; *Noyes v. Cosselman*, 29 Wash., 635, 70 P.,

61, 92 Am. St. Rep., 937; *Peck v. Herrington,* 109 Ill., 611, 50 Am. Rep., 627; *Manteufel v. Wetzel,* 133 Wis., 619, 114 N. W., 91, 19 L. R. A. (N. S.), 167; *Gannon v. Hargadon,* 10 Allen (Mass.), 106, 87 Am. Dec., 625; *Mehornay v. Fostner,* 132 Mo. App., 229, 111 S. W., 882; *Graham v. Pantel Realty Co.,* 114 Neb., 307, 207 N. W., 680; *Schuster v. Albrecht,* 98 Wis., 241, 73 N. W., 990.

I think therefore that the judgments should be reversed.

I have appended hereto a reduced sketch on page 235 of the location as set forth in the blueprint which was in evidence.