701 S.E.2d 33

**M AND M CORPORATION OF SOUTH CAROLINA, Plaintiff,**

v.

**AUTO–OWNERS INSURANCE COMPANY, Defendant.**

No. 26883.

Supreme Court of South Carolina.

Heard April 8, 2010.

Decided Oct. 11, 2010.

Rehearing Denied Nov. 17, 2010.

256

Clinch Heyward Belser, Jr., H. Freeman Belser and Michael J. Polk, all of Belser & Belser, of Columbia, for Plaintiff.

John T. Lay, Jr. and A. Johnston Cox, of Ellis Lawhorne & Sims, of Columbia, for Defendant.

Chief Justice TOAL.

The United States District Court for the District of South Carolina has certified to this Court three questions arising from a dispute concerning an all-risk Commercial Property Policy of insurance (the Policy). These questions concern the classification of water, for purposes of the insurance policy's coverage, that has been collected, concentrated, and cast onto adjoining property.

## FACTS/PROCEDURAL BACKGROUND

M & M Corporation (Plaintiff) owns a hotel in Blythe-wood, South Carolina. In August 2006, the South Carolina Department of Transportation (SCDOT) was widening and improving Blythewood Road, a process that included installation of a new underground stormwater drainage system. Before installation was complete, approximately four inches of rain fell on Blythewood in one day. Plaintiff's hotel suffered significant water damage as a result of the rainwater exiting the incomplete drainage system.

The incomplete stormwater drainage system comprised 1,600 feet of pipes and collected water from an area of approximately 15.9 acres, terminating at an exposed, above-ground thirty-inch pipe fifty feet from the edge of the hotel property line and one hundred fifty feet from Plaintiff's hotel building. The total volume of water discharged from the pipe on the day at issue was over 830,000 gallons at a rate of 6.3 feet per second. The expelled water pooled in the hotel parking lot, reaching sufficient depth to enter the hotel building and cause damage to the property.

Plaintiff filed an action against Auto–Owners Insurance Company (Defendant), seeking to recover for the water damage under the Policy. Defendant denied coverage, citing the surface water and flood exclusions contained in the Policy. The parties filed cross motions for summary judgment. The district court found resolution turns on the definitions of "surface water" and "flood" in the context of the Policy, and certified questions to this Court.

### CERTIFIED QUESTIONS

I. Under an all-risk Commercial Property Policy of insurance, does "surface water" encompass rainwater collected and channeled in a stormwater collection system?

II. If the answer to Question I is no, can such non-surface water reacquire its classification as surface water upon exit from the stormwater collection system and, if so, under what circumstances?

III. Under an all-risk Commercial Property Policy of insurance, does "flood water" encompass water discharged

from a stormwater collection system in concentrated form, pooled, and that thereafter enters a building?

## LAW/ANALYSIS

Defendant argues the water at issue is properly characterized as surface water and flood water, thus it properly denied insurance coverage because damage resulting from both classifications of water is excluded under the Policy. We disagree and find the water expelled from the pipe was not surface water or flood water. Accordingly, we answer all certified questions in the negative.

 The terms "surface water" and "flood water" are not defined in the Policy, so we must determine whether rainwater that has been collected, concentrated, and cast upon another's property is considered surface water or flood water for purposes of insurance coverage. Insurance policies are subject to the general rules of contract construction. *American Credit of Sumter, Inc. v. Nationwide Mutual Ins. Co.*, 378 S.C. 623, 628, 663 S.E.2d 492, 495 (2008). Courts interpret insurance policy language in accordance with its plain, ordinary, and popular meaning, except with technical language or where the context requires another meaning. *See id; Blakeley v. Rabon*, 266 S.C. 68, 72, 221 S.E.2d 767, 769 (1976). Policies are construed in favor of coverage, and exclusions in an insurance policy are construed against the insurer. *Buddin v. Nationwide Mutual Ins. Co.*, 250 S.C. 332, 337, 157 S.E.2d 633, 635 (1967).

The insurance policy in question has an exclusion for water damage that says, in pertinent part, damage resulting from "[f]lood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not" is not covered under the policy.

### I. Is the water "surface water?"

 Plaintiff asserts the water was not surface water when it was channeled into a stormwater collection system and cast upon its property. We agree.

 South Carolina law defines surface water as

waters of a casual and vagrant character, which ooze through the soil or diffuse or squander themselves over the surface, following no definite course. They are waters which, though customarily and naturally flowing in a known direction and course, have nevertheless no banks or channels in the soil, and include waters which are diffused over the surface of the ground, and which are derived from rains and melting snows....

*Lawton v. S. Bound R.R. Co.*, 61 S.C. 548, 552, 39 S.E. 752, 753 (1901). We need look no further to answer the question before us.[1]

While the water at issue was surface water before it was collected in the stormwater system, it then was concentrated and cast onto Plaintiff's property. Once surface water is deliberately contained, concentrated, and cast onto an adjoining landowner's property, it is no longer naturally flowing, diffuse water. Water spewing in an unnatural concentration from a stormwater drainage system lacks the identifiable characteristics of surface water the court approved in *Lawton.*

The water intruding upon Plaintiff's property was not owing to fortuitous natural causes, but instead to the deliberate actions of another. We find that naturally falling water that has been intentionally concentrated and cast upon the insured's property is not surface water for the purposes of the Policy. Accordingly, we answer the first certified question no; the water at issue is not surface water.

## II. If no, does the water become "surface water" after exiting the collection system?

▇ We also answer the second certified question no; the water does not become surface water again for the purposes of

---

1. The common enemy rule does not bear on this case as it currently stands before this Court. While its theories are instructive, the rule itself need not be analyzed to determine the instant issue. The common enemy rule does not define what surface water is, but rather prescribes how landowners may deal with the surface water on their lands. *See* William T. Toal, *Surface Water in South Carolina*, 23 S.C. L.Rev. 82, 88 (1971) (explaining surface water law in South Carolina). The common enemy rule addresses potential tort liability for obstructing and diverting the flow of surface water. Here, we are concerned with the definition of surface water in the context of a contract for insurance coverage.

the policy once it is discharged from the pipe. The water only reached Plaintiff's property in such a harmful concentration because of the deliberate containment and casting, not on account of a natural flow. Thus, the water does not regain surface water classification for the purposes of the policy once it has been expelled from the pipe.

### III. Is the water "flood water?"

As to the third certified question, whether the water at issue is "flood water," we also answer no. Defendant asserts this Court should define "flood water" as a "great flow of water over what is usually dry land," thus qualifying the water at issue as flood water and excluding the damage from coverage. While South Carolina courts have not defined "flood water," Defendant's suggested definition is far too broad. Flood waters are those waters that breach their containment, either as a result of a natural phenomenon or a failure in a man-made system, such as a levee or a dam. *See Milbert v. Carl Carbon, Inc.* 89 Idaho 471, 406 P.2d 113, 117 (1965) ("Flood waters are waters which escape, because of their height, from the confinement of a stream and overflow adjoining territory; implicit in the definition is the element of abnormality."). In either case, there is an element of fortuitousness. *See Long Motor Lines v. Home Fire & Marine Ins. Co. of Cal.,* 220 S.C. 335, 341, 67 S.E.2d 512, 515 (1951) (clarifying that in an insurance policy that defined "flood" as "the rising of streams or navigable waters," "rising" necessarily connoted an abnormal rising of the waters). We hold that the water in the present case is not flood water because it did not breach containment, but instead it was deliberately channeled and cast upon Plaintiff's land.

### Conclusion

Therefore, we find the water at issue is neither surface water nor flood water for the purposes of the Policy, and answer all three certified questions in the negative.

BEATTY and KITTREDGE, JJ., concur.

PLEICONES, J., dissenting in a separate opinion in which HEARN, J., concurs.

Justice PLEICONES.

I respectfully dissent. I believe that the water which damaged Plaintiff's property constituted "surface water" under longstanding South Carolina law. Accordingly, I would answer the first question "yes" and, as the answer disposes of the coverage issue, decline to answer the second and third questions.

### A. Surface Waters and Water Courses

Typically, where a term is not defined in an insurance policy, a court must define the term according to the usual understanding of the term's significance to the ordinary person. *See South Carolina Farm Bureau Mut. Ins. Co. v. Durham*, 380 S.C. 506, 671 S.E.2d 610 (2009). However, courts may use a different meaning in interpreting a contract with technical language or where the context requires another meaning. *See Blakeley v. Rabon*, 266 S.C. 68, 221 S.E.2d 767 (1976). Because the term "surface water" is primarily a legal term, which has long been defined in this State's case law, I interpret its use in a contract in light of case law.

Like the majority, I look first to the definition of the term "surface water," which this Court set forth in 1901:

Surface waters are waters of a casual and vagrant character, which ooze through the soil or diffuse or squander themselves over the surface, following no definite course. They are waters which, though customarily and naturally flowing in a known direction and course, have nevertheless no banks or channels in the soil, and include waters which are diffused over the surface of the ground, and which are derived from rains and melting snows; occasional outbursts of water, which in time of freshet or melting of snows descend from the mountains and inundate the country; and the moisture of wet, spongy, springy, or boggy ground.

*Lawton v. South Bound R.R. Co.*, 61 S.C. 548, 552, 39 S.E. 752, 753 (1901), citing 24 Am. & Eng. Enc. Law, at 896. The majority begins and ends its analysis of the first question with the above definition. In my view, however, further analysis is required to determine when "surface water" ceases to be "surface water."

One need look no further than the next sentence in the *Lawton* opinion to grasp the complexity of the question. Following the definition, the Court noted: "The distinguishing features of surface waters are purely negative, and consist in the absence of the distinguishing features which are common to all water courses." *Id.* at 552, 39 S.E. at 753. A "water course" is defined as follows:

> To constitute a water course, there must be a stream usually flowing in a particular direction, though it need not flow continually. It may sometimes be dry. It must flow in a definite channel, having a bed, sides, or banks, and it naturally discharges itself into some other stream or body of water. It must be something more than mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes.... It is essential to the existence of a water course that there should be a well defined bed or channel, with banks. If these characteristics are absent, there is no water course, within the legal meaning of the term. Hence, natural depressions in the land through which surface water from adjoining lands naturally flows are not water courses.

*Id.* at 552–53, 39 S.E. at 753–54. Under our case law, a water course is naturally occurring. *Id.*

### B. Application

Neither party disputes that the water constituted "surface water" when it fell to the ground, but the majority finds that the water ceased to be "surface water" once it was collected and channeled into a stormwater collection system. I disagree.

The majority concludes that water, once channeled into the storm system, lacks the characteristics of "surface water" set out in the definition in *Lawton*. Specifically, the majority notes that water collected and channeled in a stormwater system is "no longer naturally flowing, diffuse water." In my opinion, the means of disposing of surface water does not change its character. Instead, "surface water" retains its identity until it reaches and becomes a part of a natural watercourse or body, such as a lake or pool. See 78 Am. Jur.2d § 174 (2009); *Reith v. McGill Smith Punshon, Inc.*, 163 Ohio App.3d 709, 840 N.E.2d 226, 231 (2005) (surface

water "continues to be such until it reaches some well defined channel in which it is accustomed to, and does flow with other waters ... and it then becomes the running water of a stream and ceases to be surface water."). This rule comports with South Carolina case law under the Common Enemy Rule.

While I agree with the majority that the Common Enemy Rule has no direct application here, case law based on the Rule is significant in determining whether "surface water" loses that characterization once it is artificially channeled. The Common Enemy Rule provides that surface water is a common enemy, and every landowner has the right to use such means as he deems necessary for the protection of his property from damages it would cause. *See Johnson v. Williams*, 238 S.C. 623, 633, 121 S.E.2d 223, 228 (1961). There are two exceptions to the rule: (1) a landowner must not handle surface water in such a way as to create a nuisance, and (2) he must not by means of a ditch or other artificial means collect surface water and cast it in concentrated form upon the lands of another.[2] *Id.*

In *Lawton*, the plaintiff complained that the defendant had filled a ditch, causing water to inundate the plaintiff's land. *Id.* at 550–51, 39 S.E. at 753. In deciding the case, the Court found it necessary to determine the character of the water: "Was it surface water, or the water of a natural water course?"[3] *Id.* at 552, 39 S.E. at 753. After reciting the definitions of the terms "surface waters" and "water course," the Court found the waters to be "surface waters."

There is no allegation that there was "a stream usually flowing in a particular direction," nor is there any allegation that the water obstructed flowed "in a definite channel, having a bed, sides or bank," nor is there any allegation that there was "any well-defined bed or channel, with banks," through which the water obstructed was accustomed to flow; and this, as said, "is essential to the existence of a water course." Indeed, there is not a single fact alleged from

---

**2.** As no third party claim is presented, I express no opinion as to the liability, if any, of the SCDOT under this theory.

**3.** This Court alluded to the distinctions between "surface water" and a "water course" as early as 1888. *See Waldrop v. Greenville, L. & S.R. Co.*, 28 S.C. 157, 5 S.E. 471 (1888).

which an inference could be reasonably drawn that the water in question was the water of a natural water course. On the contrary, the irresistible inference from the facts stated in the complaint is that the water obstructed was nothing but surface water, which was drained from plaintiff's land by the ditch,—a mere artificial channel. No lapse of time could invest such a channel with the characteristics of a natural water course.

*Id.* at 554, 39 S.E. at 754. *Lawton* supports the view that "surface water" maintains its character, even after it is artificially channeled, until encountering a natural watercourse. The holding supports this Court's statement in *Lawton* that "[t]he distinguishing features of surface waters are purely negative, and consist in the absence of the distinguishing features which are common to all water courses." *Lawton*, 61 S.C. at 552, 39 S.E. at 753.

Moreover, I note that language from a number of South Carolina cases describes water conveyed in an artificial channel as "surface water." *See, e.g., Hoffman v. Greenville County*, 242 S.C. 34, 129 S.E.2d 757 (1963) ("There is evidence from which the jury could conclude that the damaging of the property of the respondents was caused by the cutting of ditches thereon without permission and by casting of surface water in force and impounded quantities thereon. . . ."); *Garmany v. Southern Ry.*, 152 S.C. 205, 208, 149 S.E. 765, 766 (1929) ("[s]uch artificial channel need not necessarily extend to the line or edge of the injured person's lands, in order to sustain an action for damages, but must extend to such a point that the surface water conveyed therein or thereby results in injury to such person's lands or health."); *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 543 S.E.2d 563 (Ct.App. 2001) (party "constructed a French drainage system to collect and concentrate surface water"); *Fuller–Ahrens Partnership v. South Carolina Dep't of Highways and Pub. Transp.*, 311 S.C. 177, 427 S.E.2d 920 (Ct.App.1993) ("The pipe discharges surface water from the Sumter Highway and frontage road onto Fuller–Ahrens land."). These cases suggest that the water conveyed in the artificial channel is still characterized as "surface water."

In addition to diverging from the above-cited cases, the majority's holding severely limits the Common Enemy Rule to

the point of nearly repealing the Rule. For if, as the majority holds, "surface water" loses its characterization once it is collected in an artificial structure, then a landowner may not dispose of "surface water" artificially channeled onto his property under the Common Enemy Rule as it has lost its identity as "surface water." [4] Consequently, henceforth a landowner who collects and channels surface water onto an adjoining landowner's property deprives the adjoining landowner of the ability to combat the water as a "common enemy." *Contra Cannon v. Atlantic Coast Line R.R. Co.*, 97 S.C. 233, 81 S.E. 476 (1914). In short, "surface water" is no longer a *common* enemy.

In my opinion, "surface water" remains "surface water" until it reaches and becomes a part of a natural watercourse or definite body. This bright-line definition best comports with our precedent. Consequently, the water which damaged Plaintiff's property was "surface water."

### C. "Stormwater Runoff"

Plaintiff also argues that the water collected and channeled in the stormwater system constitutes "stormwater" rather than "surface water." In Plaintiff's view, the General Assembly, in enacting the Stormwater Management and Sediment Reduction Act (the Act) "defined a new type of water in South Carolina, to wit, stormwater...." I disagree.

The Act defines "stormwater runoff" as "direct response of a watershed to precipitation and includes the surface and subsurface runoff that enters a ditch, stream, storm sewer, or other concentrated flow during and following the precipitation." S.C.Code Ann. § 48–14–20(13). Based on this definition, Plaintiff contends that once the water entered the storm system, it ceased being "surface water" and became "stormwater runoff." While water collected and channeled in a storm system may constitute "stormwater runoff" under the

---

4. The majority would hold that "surface water," once channeled, is "no longer naturally flowing, diffuse water." Moreover, section II of the majority opinion makes plain that the water, once channeled onto an adjoining landowner's property, cannot reacquire its character as "surface water." If such water does not constitute "surface water," flood water, or a natural watercourse, then I question what character the channeled and cast water attains.

Act, in my view, it also constitutes "surface water" until it reaches a natural watercourse.

### D. Conclusion

In summary, I find that under South Carolina case law, the means of disposing of "surface water" does not change its character. "Surface water" continues as such until it reaches and becomes part of a natural watercourse or definite body of water. Consequently, I would answer "yes" to Question 1 and, as the answer disposes of the coverage issue, decline to answer the second and third questions.

HEARN, J., concurs.