# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Ashley Reeves, as Personal Representative for the Estate of Albert Carl "Bert" Reeves, Petitioner,

v.

South Carolina Municipal Insurance and Risk Financing Fund, Respondent.

Appellate Case No. 2019-001756

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

Appeal from Colleton County
Perry M. Buckner III, Circuit Court Judge

Opinion No. 28034
Heard November 18, 2020 – Filed June 16, 2021

## REVERSED IN PART, VACATED IN PART

William Mullins McLeod Jr. and Colin Ram, McLeod Law Group, LLC, of Charleston for Petitioner.

C. Mitchell Brown and Brian Patrick Crotty, Nelson Mullins Riley & Scarborough, LLP, of Columbia for Respondent.

**JUSTICE FEW:** A Town of Cottageville police officer shot and killed the former town Mayor Bert Reeves. A federal jury awarded Reeves' estate $97,500,000 in

damages. The South Carolina Municipal Insurance and Risk Financing Fund, which insured the town, paid $10,000,000 to settle the federal lawsuit and two other lawsuits. The Settlement Agreement provided for two questions to be submitted to the state courts. The first question is whether the amount of indemnity coverage available under the policy is more than $1,000,000. The second question is whether the South Carolina Tort Claims Act applies to a bad faith action against the Fund. We answer the first question "yes"; we decline to answer the second question.

## I.      Facts and Procedural History

Randall Price—a police officer for the Town of Cottageville in Colleton County—shot and killed former Cottageville Mayor Albert Carl "Bert" Reeves on May 16, 2011. Ashley Reeves—the personal representative of Bert Reeves' estate—filed a wrongful death and survival lawsuit in state court against Price, the Cottageville police department, and the Town of Cottageville for negligence, assault, battery, and civil rights violations under 42 U.S.C.A. § 1983 (2012). Ashley alleged that while Price was on duty, he drove onto a dirt road to confront Reeves, blocked him in, started a fight with him, and shot and killed him. She claimed the police department and the town were liable for Price's actions because he was their employee. Ashley also alleged the police department and the town were negligent in hiring, retaining, and supervising Price, and those actions violated Reeves' civil rights under section 1983. The defendants removed the lawsuit to federal court. The parties refer to this as the Cottageville lawsuit.

Ashley filed a separate federal lawsuit against Cottageville Police Chief John Craddock. She alleged Craddock—a licensed paramedic—was present when Price shot Reeves. She claimed Craddock was liable for civil rights violations under section 1983 for failing to supervise Price, failing to intervene to stop Price, and failing to give medical care after Price shot Reeves.

The South Carolina Municipal Insurance and Risk Financing Fund provided liability insurance to Cottageville, and administered claims against it, pursuant to an insurance policy labeled the Coverage Contract. This "Fund," as we will call it, is a self-insurance liability fund established pursuant to subsection 15-78-140(A) of the South Carolina Code (Supp. 2020).[1] Ashley filed a declaratory judgment action in

---

[1] Subsection 15-78-140(A) provides that "political subdivisions of this State . . . shall procure insurance to cover [tort and other liability] risks for which immunity has been waived" under the Tort Claims Act by one of several methods, including "(4) establishing pooled self-insurance liability funds, by intergovernmental agreement."

state circuit court against the Fund requesting the court declare the extent of indemnity coverage provided in the Coverage Contract. The Fund argued then and argues now that coverage provided by the Coverage Contract is limited to $1,000,000.

The Cottageville lawsuit was the only case to go to trial. The federal jury found Price was negligent, his negligence proximately caused Reeves' death, and Price violated Reeves' constitutional rights by using excessive force and unlawfully seizing Reeves. The jury found Cottageville negligently hired, retained, and supervised Price, and violated Reeves' constitutional rights. The jury awarded Reeves' estate $7,500,000 in actual damages and $90,000,000 in punitive damages—$30,000,000 against Price and $60,000,000 against Cottageville.

Ashley and the Fund agreed to settle all three lawsuits for $10,000,000. The Settlement Agreement provided Ashley may seek declaratory judgment asking the courts to resolve the two questions.[2] The Fund agreed to pay Reeves' estate an additional $1,000,000 for each question resolved in Ashley's favor. The federal court approved the Settlement Agreement.

The Fund filed a petition with this Court asking us to decide the questions in our original jurisdiction. We declined. Ashley then filed this declaratory judgment claim by amending her pending complaint in circuit court. On the first question, the circuit court ruled in favor of Ashley, finding there was more than $1,000,000 in coverage available under the policy. On the second question, the circuit court ruled in favor of the Fund, finding the Fund is a political subdivision, and therefore, a bad faith claim against it would be subject to the Tort Claims Act.

The court of appeals reversed the circuit court's ruling regarding the amount of coverage available but affirmed the ruling the Fund is a political subdivision. *Reeves v. S.C. Mun. Ins. & Risk Fin. Fund*, 427 S.C. 613, 635, 640, 832 S.E.2d 312, 324, 326 (Ct. App. 2019). We granted a writ of certiorari to review the court of appeals' decision.

---

[2] The two questions as fully stated by the parties in the Settlement Agreement are set forth in the court of appeals' opinion. *Reeves v. S.C. Mun. Ins. & Risk Fin. Fund*, 427 S.C. 613, 620-21, 832 S.E.2d 312, 316 (Ct. App. 2019).

## II.    Indemnity Coverage Available

The Coverage Contract provided indemnity coverage for the town in areas such as general liability, business auto liability, and law enforcement liability.  The coverage at issue in this case is law enforcement liability under Section IV of the Coverage Contract.  The general provisions in Section I apply.

### A.    Insuring Language

We begin with the law enforcement liability insuring language in Section IV.  We highlighted the operative language in bold for clarity,

> **[The Fund] agrees**, subject to the limitations, terms, and conditions hereunder mentioned **to pay** on behalf of the Member or Covered Person(s) **for sums which the Member or Covered Person(s) shall be obligated to pay** exclusively **as Money Damages because of a Wrongful Act by a Member**, **a Law Enforcement Employee**, or other Covered Person(s) while acting in conjunction with Law Enforcement Employees, which is **committed while acting in both the course and the scope of his or her official duties**, as provided under the "South Carolina Tort Claims Act" where a South Carolina state law is involved, or while acting in both the course and scope of a mutual aid agreement between governmental entities for the temporary sharing of Law Enforcement Employees or other Covered Person(s) under the terms and circumstances specified therein, and **which results in**:
>
> a. Property Damage or **Bodily Injury** which is first caused and first becomes manifest during the Coverage Period, **provided the Wrongful Act amounts to an Occurrence**; **or**
>
> b. **Personal Injury** or Advertising Injury which is first caused and first becomes manifest during the Coverage Period.

Under this insuring language, the Fund agreed to pay when a Member (Cottageville) or a Law Enforcement Employee (Price or Craddock) committed a Wrongful Act in the course and scope of his official duties, and the Wrongful Act resulted in Bodily Injury or Personal Injury. The parties agree Price and Craddock were acting within the scope of their official duties when Price killed Reeves. The federal jury determined Cottageville and Price committed numerous Wrongful Acts.

The next question is whether the Wrongful Acts resulted in Bodily Injury. Bodily Injury is defined in the Coverage Contract. We highlighted the operative language in bold for clarity,

> **"Bodily Injury" means physical injury to any person (including death)** and any mental anguish or mental suffering associated with or arising from such physical injury. However, for purposes of this Section IV, Bodily Injury does not include such injuries if they result directly and immediately from the infliction of Personal Injury, including without limitation assault and battery; any such resulting injuries shall be deemed to be part of the Personal Injury.

Reeves is dead; that is a Bodily Injury. Therefore, as the parties agree, the insuring language provides coverage in this case.

We turn then to the policy limits for law enforcement liability indemnity coverage. The Contract Declaration page for Section IV of the Coverage Contract provides the "Liability Limit" is "$1,000,000" "Per Occurrence."

The term "Occurrence" is one we commonly use. In that common usage, the death of Bert Reeves was one tragic occurrence. However, we are not permitted to use our intuitive definition of a term defined in an insurance policy. The Fund wrote the definition of "Occurrence" applicable here, which is found in Section I, the General Provisions section of the Coverage Contract. Again, we put the operative language in bold for clarity,

> **"Occurrence" means an accident which results in Bodily Injury** or Property Damage, the original cause of which and the initial damage from **which happened during the Contract Period** set forth in the Declarations. Without limitation, all references to any type of injury

arising out of or from an Occurrence or being caused by an Occurrence employ the foregoing meaning. Subject to the foregoing, "Occurrence" includes continuing exposure to the same harmful conditions. All such continuing exposure, damage, or injury shall be treated as one Occurrence.

Only when used **to describe coverage limits on a per "Occurrence" basis** or when otherwise describing whether an event or series of events constitutes one loss for coverage purposes or more than one loss, **the word "Occurrence" means a covered event of the sort expressly described in the Insuring Agreement of the relevant Coverage Section** pertaining to the loss or claim, whether an Occurrence (as defined in the opening paragraph of this General Definition or as defined in the separate definition, if any, appearing in the Definitions part of the relevant Coverage Section), a **Wrongful Act**, a Loss, or an Offense causing Personal Injury or Advertising Injury, as those terms are defined in the relevant Coverage Section.

This is not a simple and straightforward definition. In effect, it is three definitions, one for each context in which the Fund used the term Occurrence in the Coverage Contract. The first sentence of the definition provides its central meaning—an "'Occurrence' is an accident which results in Bodily Injury." The definition continues by explaining the three specific contexts in which the Fund used the term in the policy. The first context is set forth in the second sentence of the definition, which further explains the central meaning by reiterating the definition applies when an injury "arises out of" or is "caused by" an Occurrence. The first context applies when the Occurrence is an act or failure to act that causes injury. Under the terms of the Coverage Contract, therefore, an Occurrence is some act or failure to act that causes an injury.

The second context is addressed in the next two sentences of the definition, which are the last two sentences of the first paragraph. These two sentences explain that when "continuing exposure to the same harmful conditions" results in damage or injury, there is only one Occurrence. This case is not a "continuing exposure" situation, and thus, this second context for the definition of Occurrence is not applicable here.

The third context overlaps with the first context and is applicable here. It is found in the second paragraph, which applies when Occurrence is "used to describe limits on a per 'Occurrence' basis or when otherwise describing whether an event or series of events constitutes one loss . . . ." In that context—this context—"the word 'Occurrence' means a covered event of the sort expressly described in the Insuring Agreement of the relevant Coverage Section."

This takes us back to the insuring language quoted above. The "covered event . . . expressly described" in the insuring language is a Wrongful Act. This portion of the definition of Occurrence specifically equates Occurrence with Wrongful Act.[3] The term Wrongful Act is defined as "any actual or alleged error in the performance or failure to perform an official duty . . . or any omission or neglect in performing an official duty; or any breach of an official duty . . . ."

The meaning of the term Occurrence is central to understanding the Liability Limit for law enforcement liability coverage in Section IV. The Coverage Contract does not define Occurrence the way we commonly use it, in which some act or failure to act results in a tragic occurrence.[4] Rather, under the Fund's definition, the tragic death of Bert Reeves was the result of an Occurrence. The Coverage Contract defines Occurrence as a Wrongful Act that results in Bodily Injury. Ashley argues Reeves' death was the result of at least four Wrongful Acts. She argues Cottageville's negligent hiring, retention, and supervision of Price, and Price's use of deadly force, are four different Wrongful Acts. The federal jury found in Ashley's favor for each Wrongful Act, which demonstrates she is correct that four Wrongful Acts occurred. The four Wrongful Acts are four Occurrences under the terms of the Coverage Contract.

---

[3] The definition provides, "'Occurrence' means a covered event of the sort expressly described in the Insuring Agreement . . . , whether an Occurrence . . . , a Wrongful Act, a Loss, or an Offense."

[4] Our analysis is narrow and relates only to the term "Occurrence" as it is defined in this Coverage Contract. Our analysis is irrelevant, for example, to the term "Occurrence" as it is used in the South Carolina Tort Claims Act. *See* S.C. Code Ann. § 15-78-30(g) (2005) (providing, "'Occurrence' means an unfolding sequence of events which proximately flow from a single act of negligence").

Our conclusion there was more than one Occurrence is supported by considering just two of the several Wrongful Acts Ashley contends "occurred." Even under the Fund's interpretation of the Coverage Contract, these two acts are separate Occurrences. First, Price shot Reeves. Though the gunshot left Reeves in danger for his life, and caused him eventually to die, he was still alive immediately afterwards. Second, Craddock allegedly refused to render medical care to Reeves, despite Craddock's training as a paramedic. The Craddock case was never tried, but considering the allegations against him, it is not possible to view (1) Price shooting Reeves and his eventually resulting death, and (2) Craddock standing by refusing to render medical care while Reeves suffered through the last few minutes of life, as the same Occurrence. So, even if we were to find all of the Wrongful Acts by Price, Craddock, the police department, and the town were not separate Occurrences, we cannot escape the reality that the two acts used in this illustration are two separate Occurrences resulting in separate claims for separate damages.

Returning to the applicable insuring language, however, we do find Cottageville and Price committed at least four Wrongful Acts while acting in the course and scope of their official duties: Cottageville's negligent hiring, retaining, and supervising Price, and Price's use of deadly force in shooting Reeves. If the jury in the Craddock case agreed Chief Craddock violated Reeves' civil rights by failing to render medical care, that would be another Wrongful Act and a fifth Occurrence. Section IV provides coverage for each of the four Occurrences the jury found occurred. The Liability Limit is the number of Occurrences/Wrongful Acts times $1,000,000. Unless some other limitation in the Coverage Contract applies, the four Occurrences require the Fund to pay more than $1,000,000 in indemnity coverage.[5]

---

[5] The circuit court ruled in favor of Ashley on the first question for the additional reason that there were multiple categories of damages caused by the defendants' Wrongful Acts, including damages for wrongful death and damages that survived Reeves' death. The circuit court found the multiple categories of damages rendered the policy limit to be in excess of $1,000,000. *See Reeves*, 427 S.C. at 631, 832 S.E.2d at 321-22 (explaining the circuit court's alternative basis for its ruling). Because our decision is based on the number of Occurrences, we need not address this alternative point. *See Whiteside v. Cherokee Cty. Sch. Dist. No. One*, 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993) ("In view of our disposition of this issue, we need not address appellants' remaining exceptions." (citations omitted)).

## B. Limitations

The Fund argues there are three applicable limitations in the Coverage Contract: (1) the No Duplication clause in Section I; and two clauses in the "Limit of Liability" portion of Section IV—(2) the "Limit of Liability" clause; and (3) "[the Fund]'s Limit of Liability" clause. We find none of the limitations apply.

The No Duplication clause contains two prohibitions. First, it limits recovery for any claim that invokes liability coverage from more than one section of the Coverage Contract. Ashley's claims involve only law enforcement liability, and thus, invoke liability coverage only under Section IV. Next, the No Duplication clause provides, "A single Coverage Limit applies to all claims or suits involving substantially the same injury or damage, or a progressive injury or damage." "Coverage Limit" is not defined in the Coverage Contract. The Fund would have us assume "Coverage Limit" means "$1,000,000," but there is no support for this position in the language of the policy. As the term "Coverage Limit" is not defined, we will not read it as limiting coverage more than the defined term "Liability Limit." *See Walde v. Ass'n Ins. Co.*, 401 S.C. 431, 439, 737 S.E.2d 631, 635 (Ct. App. 2012) ("Policies are construed in favor of coverage, and exclusions in an insurance policy are construed against the insurer." (quoting *M & M Corp. of S.C. v. Auto–Owners Ins. Co.*, 390 S.C. 255, 259, 701 S.E.2d 33, 35 (2010))). We find the undefined term Coverage Limit is synonymous with "Liability Limit," which is defined as "$1,000,000" "Per Occurrence."

The second limitation the Fund claims applies is in the "Limit of Liability" portion of Section IV of the Coverage Contract. The limitation provides, "Only a single limit or Annual Aggregate . . . will apply, regardless of the number of persons or organizations injured or making claims, or the number of Covered Persons who allegedly caused them, or whether the damage or injuries at issue were continuing or repeated over the course of more than one Coverage Period." This language does not limit Ashley's claims because Section IV does not contain an "Annual Aggregate," and to the extent there is a "single limit"—another undefined term—the Coverage Contract provides it is the Liability Limit: "$1,000,000" "Per Occurrence."

The third limitation the Fund claims applies is also in the "Limit of Liability" portion of Section IV. The limitation provides the Fund's "liability for any one occurrence/wrongful act will be limited to $1,000,000 per Member regardless of the number of Covered Persons, number of claimants or claims made . . . ." The Fund focuses on "limited to $1,000,000 per Member" to argue it does not have to provide

coverage from different wrongful acts committed by Cottageville and its officers. However, the Fund overlooks the key language in the limitation—that liability is limited to $1,000,000 per Member "for any one occurrence/wrongful act." There were multiple occurrences/wrongful acts. Therefore, this provision does not limit Ashley's claims.

To summarize, the insuring language of the Coverage Contract provides $1,000,000 in coverage for each Occurrence, which is a Wrongful Act resulting in Bodily Injury. Cottageville's negligent acts of hiring, retaining, and supervising Price, and Price's use of deadly force, are separate Occurrences under the terms of the Coverage Contract. No limitation applies. Therefore, there is more than $1,000,000 in indemnity coverage available.

## C.    Court of Appeals' Analysis

The structure of the court of appeals' opinion differs considerably from ours, which this Court should explain. We acknowledge the Coverage Contract is a complicated insurance policy which must be analyzed in a complicated factual scenario with at least four defendants and numerous Wrongful Acts. Respectfully, however, we find the court of appeals erred primarily because it did not complete its analysis of the insuring language of the Coverage Contract before considering whether the limiting language affected the insuring language. Under the proper structure for analyzing any insurance policy, the analysis begins with the insuring language. The court should complete that analysis, and then determine whether there is any other provision in the policy that limits or excludes what is insured.

The court of appeals followed that structure through what it called its first and second steps of analysis. *Reeves*, 427 S.C. at 627-29, 832 S.E.2d at 319-20. In its third step, however, the court of appeals considered whether the law enforcement liability coverage for Bodily Injury was limited by the definition of Personal Injury. 427 S.C. at 629-30, 832 S.E.2d at 320-21. The court of appeals relied on the following sentence in the Coverage Contract, as set forth in the definition we quoted above, "Bodily Injury does not include such injuries if they result directly and immediately from the infliction of Personal Injury."

The court of appeals erred in relying on this sentence for several reasons. First, this sentence from the Coverage Contract is confusing, if not indecipherable. The court of appeals read the phrase "such injuries" to refer all the way back in the definition of Bodily Injury to "physical injury to any person (including death)." Under the court of appeals' reading, the sentence provides "Bodily Injury" does not include

"physical injury" or "death." However, the policy definition of the term states, "'Bodily Injury' means physical injury . . . (including death)." Bodily Injury cannot be defined to "mean" physical injury including death and then suddenly not mean physical injury *or* death. The more logical way is to read the phrase "such injuries" as referring back in the definition of Bodily Injury only to "any mental anguish or mental suffering associated with or arising from such physical injury." Under this reading—which still is confusing—when an insured commits an Offense that results in Personal Injury, the Coverage Contract does not provide coverage for "mental anguish or mental suffering," but for only the physical injury itself. As our courts have repeatedly stated, confusing and ambiguous language in insurance policy limitations must be construed against the insurer that drafted the policy. *See, e.g.*, *Walde*, 401 S.C. at 439, 737 S.E.2d at 635.[6]

Second, the court of appeals' reading limits coverage only when the sentence is considered in conjunction with the definition of Offense. The court stated "to recover under Personal Injury, the Wrongful Act that caused the Personal Injury must amount to a covered Offense." 427 S.C. at 629, 832 S.E.2d at 320. Thus, the Personal Injury limitation applied by the court of appeals operates by incorporating the language "Offense is subject to a single Coverage Limit of $1,000,000" into the analysis. *See* 427 S.C. at 633, 832 S.E.2d at 323 (stating "the Offense is subject to a single Coverage Limit of $1,000,000"). As we explained, however, the term "Coverage Limit" is undefined, and we will not read it to limit coverage under the policy to $1,000,000.

Third, the term Personal Injury does not include all of the Wrongful Acts the jury found to have occurred in this case. The Coverage Contract defines Personal Injury to "mean[] only the following Offenses," and then lists "assault and battery," "violation of civil rights," and others not applicable here. The definition does not

---

[6] The circuit court found the term Occurrence to be ambiguous, 427 S.C. at 633-34, 832 S.E.2d at 323, but the court of appeals apparently found the entire Coverage Contract to be clear and unambiguous, 427 S.C. at 634-35, 832 S.E.2d at 323-24. As we explained, we find the insuring language applicable to this case, including the Liability Limit on the Contract Declarations page, to be unambiguous. We also find there is no clear limitation in the policy that would reduce the available coverage to $1,000,000. To the extent it may be argued that such a limitation exists, the argument ignores numerous ambiguities in the limiting language. When those ambiguous provisions are construed against the insurer, the insuring language is limited only by the Limit of Liability provision, "$1,000,000" "Per Occurrence."

list negligence, such as the jury found Price committed, or negligent hiring, retention, or supervision, such as the jury found the town committed. Each of these were Wrongful Acts that resulted in the death of Reeves, but they are not Personal Injury as that term is defined in the policy. Thus, even to the extent Reeves' death did result directly from Offenses as included in the definition of Personal Injury, Reeves' death also resulted directly from Wrongful Acts that meet only the definition of Bodily Injury.

Finally, the court of appeals was not correct to conclude "the coverage issue [must be analyzed] exclusively under the Coverage Contract's provisions for Personal Injury." 427 S.C. at 622, 832 S.E.2d at 317; *see also* 427 S.C. at 630, 832 S.E.2d at 321 (stating "the Bodily Injury is deemed part of the Personal Injury for coverage purposes"); 427 S.C. at 634, 832 S.E.2d at 323 (holding "coverage for *Offense* is at issue, not coverage for *Occurrence*"). A straightforward analysis of the insuring language of the Coverage Contract reveals clear and unambiguous indemnity coverage for liability incurred when a Member (Cottageville) or Law Enforcement Employee (Price or Craddock) commits Wrongful Acts that result in Bodily Injury "(including death)."

## III. Bad Faith Tort Claim

The second question the Settlement Agreement calls on us to answer is whether a bad faith claim against the Fund is subject to the South Carolina Tort Claims Act. For two reasons, we decline to answer the question. We vacate the answer given by the court of appeals. *See Reeves*, 427 S.C. at 635-40, 832 S.E.2d at 324-26.

The first reason we decline to answer the question is we cannot be sure the claim is assignable. The claim did not initially belong to Ashley, but instead, to the parties insured by the Fund: Cottageville, Price, and Craddock. According to the full text of the second question, "[The Fund] was informed that any bad faith claims that exist in favor of Cottageville would be assigned to [Ashley]." 427 S.C. at 620-21, 832 S.E.2d at 316. The declaratory judgment claim Ashley filed pursuant to the Settlement Agreement also states, "Cottageville informed [the Fund] it intended to assign any bad faith claims in its favor that may exist against [the Fund] to

[Ashley]."[7]  This Court has never recognized the validity of any assignment of a bad faith claim; certainly we have not done so in the circumstances of this case.[8]

In other factual situations, South Carolina's federal courts have held a bad faith claim is assignable.  In *Schneider v. Allstate Insurance Co.*, 487 F. Supp. 239 (D.S.C. 1980), for example, the injured plaintiff sued the at-fault driver insured by Allstate with liability limits of $10,000.  487 F. Supp. at 240.  Before trial, the plaintiff offered to settle within policy limits.  The jury awarded a total of $68,000.  Allstate paid its liability limits but no more, leaving its insured with an excess judgment of $58,000.  The at-fault driver then assigned his bad faith claim against Allstate to the plaintiff, presumably in exchange for a covenant not to execute on the judgment.  *Id.* In the plaintiff's suit against Allstate on the assigned claim, the district court held the bad faith claim was assignable.  487 F. Supp. at 245.

The assignment in *Schneider*, however, appears considerably different from the assignment in this case.  The party making the assignment was an individual, not a town.  487 F. Supp. at 240.  To reach its conclusion the bad faith claim was

---

[7] The record before us does not contain the actual assignment.

[8] While we have no concern regarding any improper conduct in this case, the practice of assigning bad faith claims to leverage insurance companies to pay more than policy limits has apparently become fashionable in recent years.  In *Fowler v. State Farm Mutual Automobile Insurance Co.*, 300 F. Supp. 3d 751 (D.S.C. 2017), for example, the plaintiff's attorney sent a demand letter to State Farm insisting the insurer pay its policy limits within a week, "at noon."  300 F. Supp. 3d at 753. Despite State Farm's apparent acceptance of the demand, the plaintiff's attorney deemed the response a counteroffer and rejection, filed suit against the insured, negotiated with the insured—now its adverse party in a lawsuit—for a "confession of judgment of $7 million" without State Farm's involvement, took a purported assignment of the insured's bad faith claim, and sued State Farm for bad faith.  *Id.* After State Farm removed the case, the district court granted summary judgment, in part because, "Defendant's response to the offer could not constitute bad faith as a matter of law."  300 F. Supp. 3d at 753-54.  The Fourth Circuit affirmed.  759 F. App'x 160 (4th Cir. 2019).  While the *Fowler* case suggests "bad faith" of another form that we stress is not present here, it illustrates reasons it may not be appropriate to permit assignment of bad faith claims under all circumstances.  *But see* Constance A. Anastopoulo, *A New Twist on Remedies: Judicial Assignment of Bad Faith Claims*, 50 Ind. L. Rev. 727 (2017) (arguing bad faith claims should be assignable).

assignable, the district court in *Schneider* relied exclusively on the applicability of the South Carolina survival statute. 487 F. Supp. at 241 (citing S.C. Code Ann. § 15-5-90 (1976) (survival statute); *Doremus v. Atl. Coast Line R.R. Co.*, 242 S.C. 123, 142, 130 S.E.2d 370, 379 (1963) (holding a personal injury claim is assignable because it survives the death of the real party in interest)). In this case, the party making the assignment is a town, to which the survival statute does not apply. *See* S.C. Code Ann. § 15-5-90 (2005) (providing this statute—the survival statute—applies to "a deceased person and . . . an insolvent person or a defunct or insolvent corporation"). In *Schneider*, the plaintiff made an offer to settle within policy limits. 487 F. Supp. at 240. In this case, the parties never were able to agree on the policy limits. In *Schneider*, the judgment against the insured appears to have become final. In this case, the verdict against the insured remained subject to the district court's ruling on post-trial motions and an appeal to the Fourth Circuit.

The most significant difference between *Schneider* and this case, however, is that in *Schneider* the insurance company did not satisfy the judgment, but left the insured exposed beyond the policy limits. Here, the Fund satisfied the judgment. The insured paid nothing.

The question of whether a bad faith claim is assignable under the circumstances present in this case, to our knowledge, has never been presented to this Court. While it seems to us that allowing assignment under the circumstances present in *Schneider* would be appropriate, we also recognize there are other considerations that may warrant refusing to allow assignment of bad faith claims in all situations. *See generally Fowler v. Hunter*, 388 S.C. 355, 362, 697 S.E.2d 531, 535 (2010) (permitting the assignment of a professional negligence claim against the insurer as a part of a settlement with an at-fault driver, "provided the risk of collusion is minimized").[9] Until we decide whether such a claim may be assigned in the first place, we are hesitant to answer the question posed by the parties in this case.

The second reason we decline to answer the question relates to the validity of any bad faith claim Cottageville may have had against the Fund. On this point, we do not address whether the Fund acted in bad faith. There is simply no evidence in the

---

[9] The assigned claim in *Fowler* was a professional negligence claim against the insurer; it was not a bad faith claim. 388 S.C. at 360, 697 S.E.2d at 533. However, our analysis in *Fowler* of the danger of collusion as a predicate to permitting the assignment of claims pursuant to a settlement is relevant to whether assignment of bad faith claims should be permitted in all situations.

record either way, so we have no way of knowing.  Rather, we address the nature of the Fund's duty to its insureds.

This Court has recognized in numerous opinions that an insurer must act reasonably and in good faith in defending its insured.  *See, e.g.*, *Miles v. State Farm Mut. Auto. Ins. Co.*, 238 S.C. 374, 380, 120 S.E.2d 217, 220 (1961) ("In the defense of an action against its insured, an insurer is bound not only to act in good faith but also to exercise reasonable care." (citing *Tiger River*[10] *Pine Co. v. Maryland Cas. Co.*, 163 S.C. 229, 234-35, 161 S.E. 491, 493-94 (1931))).  This duty includes the insurer's obligation to settle a lawsuit against its insured within policy limits if it is unreasonable to refuse to do so.  *See Nichols v. State Farm Mut. Auto. Ins. Co.*, 279 S.C. 336, 339, 306 S.E.2d 616, 618 (1983) (stating "an insurer's unreasonable refusal to settle within policy limits subjects the insurer to tort liability" (citing *Tyger River Pine Co. v. Maryland Cas. Co.,* 170 S.C. 286, 290-91, 170 S.E. 346, 348 (1933))).  We also recognized an insurer may be liable for consequential damages in addition to the amount of the excess judgment if the insurer acts in bad faith to the insured in some respect other than protecting the insured from an excess judgment.  *See Tadlock Painting Co. v. Maryland Cas. Co.*, 322 S.C. 498, 501, 473 S.E.2d 52, 53 (1996) ("[I]mplicit in the holding [of *Nichols*] is the extension of a duty of good faith and fair dealing in the performance of *all* obligations undertaken by the insurer for the insured." (quoting *Carolina Bank & Tr. Co. v. St. Paul Fire & Marine Co.*, 279 S.C. 576, 580, 310 S.E.2d 163, 165 (Ct. App. 1983))); 322 S.C. at 504, 473 S.E.2d at 55 (permitting the recovery of consequential damages).

As we stated, we do not have before us any facts regarding what conduct by the Fund may form the basis of a bad faith claim.  Nevertheless, none of the cases we previously decided in which we recognized a right of action for bad faith against an insurer appear to bear any relationship to this case.  Here, the Fund argued the extent of its limit for liability was $1,000,000.  Although we disagree, we find the Fund's position reasonable.  The Coverage Contract gave the Fund the exclusive right— "subject to the Limits of Liability"—to "conduct negotiations and enter into such settlement of any claim or suit as [the Fund] deems expedient."  The liability issues at the trial of the Cottageville lawsuit were hotly contested, and there is no indication of any certainty the plaintiff would prevail before the jury.  We are aware of no conduct by the Fund which might subject it to liability other than asserting its insureds right to a trial by jury.  *See In re Mt. Hawley Ins. Co.*, 427 S.C. 159, 170,

---

[10] The River and the former eponymous "Pine Company" are correctly spelled "Tyger."  *See Sentry Select Ins. Co. v. Maybank L. Firm, LLC*, 426 S.C. 154, 158 n.3, 826 S.E.2d 270, 272 n.3 (2019).

829 S.E.2d 707, 714 (2019) ("Of course, . . . '[i]f there is a reasonable ground for contesting a claim, there is no bad faith.'" (alteration in original) (quoting *Crossley v. State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 360, 415 S.E.2d 393, 397 (1992))). When the verdict far exceeded any view of policy limits, the Fund settled the case, leaving its insureds insulated from any excess judgment. While it is conceivable an insurer may subject itself to liability for consequential damages for bad faith conduct in some other respect, we do not condone the idea an insurer may incur bad faith liability for simply taking a case to the jury, when the insurer satisfied the judgment after trial without exposing the insured to excess liability.

For these two reasons, we decline to answer the second question.

## IV. Conclusion

We reverse the court of appeals' determination regarding the amount of indemnity coverage available. We vacate the court of appeals' determination that a bad faith claim against the Fund is barred by the South Carolina Tort Claims Act.

**BEATTY, C.J., HEARN and JAMES, JJ., concur. KITTREDGE, J., concurring in result in a separate opinion.**

**JUSTICE KITTREDGE:**  I concur in result.  I write separately because I respectfully disagree with the majority's approach in determining the number of occurrences.  I would hold the two lawsuits filed by the Estate of Albert "Bert" Reeves involved two occurrences.

The South Carolina Municipal Insurance and Risk Financing Fund (the Fund) provided liability coverage to the Town of Cottageville and its police officers.  The question presented by the parties is:

> (1) Do the claims made and the verdict rendered against the Town of Cottageville and Randall Price, relating to the hiring, retention, supervision, and shooting death of Bert Reeves result in there being more than $1,000,000.00 in indemnity coverage available under the terms of the [Fund's] Coverage Contract with the Town of Cottageville with respect to all such claims including the claims made against John Craddock in the separately styled action referenced above?  Reeves asserts there is more than one occurrence based on the facts and claims and the jury's verdict relating to the hiring, retention, supervision, and shooting death of Bert Reeves, and, thus, there is more than $1,000,000.00 in indemnity coverage available under the Coverage Contract.  [The Fund] asserts the Coverage Contract is limited to a total of $1,000,000.00 in indemnity coverage.

*Reeves v. S.C. Mun. Ins. & Risk Fin. Fund*, 427 S.C. 613, 620, 832 S.E.2d 312, 316 (Ct. App. 2019) (internal alteration marks omitted).

The facts are fully set forth in the majority opinion as well as the court of appeals' opinion.  Cottageville Police Officer Randall Price shot former Cottageville Mayor Bert Reeves.  Cottageville Police Chief John Craddock was present when Price shot Reeves.  Craddock, a trained paramedic, refused to provide medical assistance to Reeves as he lay dying from the gunshot wound.  In the action against Officer Price and the Town of Cottageville, a jury awarded Reeves's estate $97.5 million, consisting mainly of punitive damages.  Reeves's estate and the Fund settled both cases, which included the claim against Craddock.

The parties agreed that Reeves's estate would receive—in addition to a guaranteed $10,000,000 settlement—an additional $1,000,000 payment for each of two possible questions answered in favor of Reeves's estate.[11]

Reeves's estate argued there were four "occurrences" under the terms of the Fund's insurance policy with Cottageville; the Fund argued there was only one occurrence. Once we determine there was more than one occurrence, we have resolved the appeal—under the terms of the question presented by the parties, it matters only whether there was more than one occurrence (as asserted by Reeves's estate), not precisely how many occurrences there were. The majority, however, holds there were exactly four occurrences. I do not agree. If we must decide the number of occurrences, in my judgment, the policy provides there were only two occurrences.

As I construe the majority opinion, it seems the majority equates each "wrongful act" with a covered "occurrence" under the policy, irrespective of the presence or absence of a resulting injury. In construing the insuring language portion of the policy, the majority opinion states, "[t]his portion of the definition of Occurrence specifically equates Occurrence with Wrongful Act." I agree with the majority insofar as a single wrongful act or multiple wrongful acts resulting in an injury is an occurrence. I respectfully disagree that a wrongful act, by itself with no resulting injury, "equates [to an] Occurrence."

The policy defines "wrongful act" as

> any actual or alleged error in the performance or failure to perform an official duty; or any misstatement, misleading statement, or misleading act made or done in the course of official duty and upon which a claimant or plaintiff has relied to his, her, or its detriment; or any omission or neglect in performing an official duty; or any breach of an official duty, including misfeasance, malfeasance and nonfeasance; but only, with respect to any or all of the foregoing, when committed by a Member or by a Covered Person(s) while acting within both the course and the scope of his or her official duties, as provided under the "South Carolina Tort Claims Act."

The policy defines "occurrence" as the term is commonly understood—"an accident which results in Bodily Injury." "Bodily Injury" is further defined as

---

[11] The majority and I answer only the first of the two questions presented by the parties.

"physical injury to any person (including death)." The policy language requires the Fund to only pay covered claims for "a Wrongful Act . . . *which results in . . . bodily injury* . . . provided the Wrongful Act amounts to an Occurrence." (Emphasis added.) Thus, as I read the policy's language, the Fund is not required to cover a wrongful act that does *not* result in bodily injury.

I do agree with the majority that the policy language does allow for coverage for more than a single occurrence. That, however, does not negate what I view as a clear requirement that a wrongful act result in an injury. What links a wrongful act to an occurrence is the resulting injury. Absent a resulting injury, there is no occurrence, regardless of the number of wrongful acts.

I acknowledge a host of wrongful acts committed by Officer Price and the Town of Cottageville.[12] But under the terms of the policy, a wrongful act *by itself* is not an occurrence and does not trigger coverage. My review of the policy persuades me that coverage is activated only when the wrongful act or wrongful acts result in the injury—that is the occurrence. I would hold the parties to the unambiguous definition of occurrence, which expressly requires a resulting injury. Here, there were two occurrences, one which resulted from the wrongful acts of Officer Price and the Town of Cottageville, and the second stemming from Chief Craddock's willful failure to render aid to Reeves. Concerning the second occurrence—the claim against Chief Craddock—the record stipulates that Reeves was still alive after being shot by Officer Price, yet Chief Craddock (a trained paramedic) decided to watch Reeves die rather than attempt to save his life or promptly summon medical assistance.

Therefore, as far as determining there was more than one occurrence, I concur in result. I do fully concur in the balance of the majority opinion.

---

[12] The majority agrees with Reeves's estate that "Cottageville's negligent hiring, retention, and supervision of Price, and Price's use of deadly force, are four different Wrongful Acts." I take no issue with the majority in this regard. I part company with the majority in equating a wrongful act with a covered occurrence.